# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALBERT MCKINLEY IV,

        Defendant-Appellant.

UNPUBLISHED
January 23, 2018

No. 332519
Macomb Circuit Court
LC No. 2015-003636-FC

Before: METER, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder, MCL 750.316, armed robbery, MCL 750.529, and conspiracy to commit armed robbery, MCL 750.157a and MCL 750.529. The trial court sentenced defendant, as a fourth-habitual offender, MCL 769.12, to concurrent sentences of life without parole for first-degree murder, and life in prison for armed robbery and conspiracy to commit armed robbery. We affirm.

## I. FACTS

On March 26, 2015, defendant and Ujuan Burton drove to Bernie's Market in Clinton Township in a truck belonging to Burton's mother. The two parked some distance from the store. Burton left the vehicle and walked to the store while defendant drove the truck behind the store. Burton entered the store with a gun drawn. The owner of Bernie's Market, Emil Salem, fired his own weapon at Burton, striking him in the face and foot. However, Burton returned fire. One shot struck Salem in the head, killing him.

Burton left the store and went to the truck that had been relocated by defendant. Defendant then drove Burton to a home in Detroit. During the drive, the men contacted Shardae Burt, who was Burton's girlfriend at the time. Burt also had some medical training. Burt met the two at the home in Detroit. She drove Burton to a hospital in Findlay, Ohio in an effort to avoid detection in Michigan. However, the hospital in Findlay transferred Burton to a hospital in Toledo, Ohio. In Toledo, Burton and Burt were arrested. Burt was picked up by Detective James Hertel, who worked for the Clinton Township Police Department.

Defendant's name came up in the investigation after Burt was driven back to Michigan. A warrant was obtained for defendant's arrest, and he was arrested on August 19, 2015. That

-1-

evening, defendant spoke to Hertel and Detective Dan Quinn. Defendant first denied being present at the scene of the robbery, claiming instead that he was with his girlfriend that night. However, when presented with evidence contradicting this version of events, defendant asked to speak with his attorney. He also asked to speak with family members. As will be discussed in more detail later in this opinion, the detectives honored both requests.

After speaking with his family, defendant asked to speak with the detectives again. After confirming that defendant wished to speak to them without an attorney, defendant gave a different version of the events of March 26, 2015. Defendant admitted that he was with Burton the night of the robbery. He admitted that the two drove to the store, and that Burton had explained his desire to commit the robbery. Defendant claimed that he did not agree with Burton, and in fact, tried to talk Burton out of committing the robbery. However, Burton ultimately could not be swayed. Defendant acknowledged that after the robbery, he drove Burton to the home in Detroit, and that Burt then drove Burton to Ohio. Defendant also explained that he helped move the truck to a different location, after which it was thoroughly cleaned.[1]

At trial, evidence was presented through Sergeant Randy Diegel of the Eastpointe Police Department. Diegel explained that he was part of task force that investigated a series of armed robberies of liquor stores in December 2000 and January 2001. Defendant and Burton were arrested as a result of this operation after they committed a carjacking and attempted what would have been their eighth armed robbery over the course of approximately two weeks. Diegel explained that after his arrest, defendant admitted to participating in the robberies and carjacking. As a result of these crimes, defendant was incarcerated until his release in January 2013. Evidence of another, much more recent armed robbery was also admitted at defendant's trial. During his interview with Quinn and Hertel, defendant admitted that he, Burton, and a third man committed another armed robbery just a few months before the robbery of Bernie's Market.

## II. DISCUSSION

## A. MOTION TO SUPPRESS

Defendant first argues that the trial court erred when, after holding a *Walker*[2] hearing, the court denied his motion to suppress his statements to police. We disagree. After a *Walker* hearing, the trial court's factual findings are reviewed for clear error, while the trial court's ultimate decision is reviewed de novo. *People v Smart*, 304 Mich App 244, 247; 850 NW2d 579

---

[1] At trial, evidence of a second confession by defendant, this time to a fellow inmate with whom defendant had a prior relationship, was also presented. In this confession, defendant expressed feeling some trepidation regarding whether to commit the robbery, but only because he believed Salem might be armed. Eventually, defendant agreed with Burton to commit the robbery. After the robbery, defendant instructed his girlfriend to dispose of the gun used by Burton because it could be traced back to defendant.

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

(2014). A factual finding is clearly erroneous if it leaves this Court with the "definite and firm conviction that the trial court made a mistake." *People v Manning*, 243 Mich App 615, 620; 624 NW2d 746 (2000).

Before addressing the issues raised before us, and because defendant seemingly fails to understand the distinction, we begin with the following observations. A criminal defendant's right to counsel may be derived from two different sources. While the Sixth Amendment is one source of a criminal defendant's right to counsel, there also exists "a prophylactic right [to counsel] found in the [United States] Supreme Court's jurisprudence relating to the Fifth Amendment right against compelled self-incrimination and to due process . . . ." *People v Williams*, 244 Mich App 533, 538; 624 NW2d 575 (2001). But the "Fifth Amendment right to counsel is distinct and not necessarily coextensive with the right to counsel afforded criminal defendants under the Sixth Amendment." *Id.* As this Court has explained:

> Indeed, the Fifth Amendment right to counsel during a custodial interrogation serves an entirely different purpose than the Sixth Amendment right to counsel at trial. The right to counsel found in the Fifth Amendment "is designed to counteract the 'inherently compelling pressures' of custodial interrogation," *McNeil v Wisconsin*, 501 US 171, 176; 111 S Ct 2204; 115 L Ed 2d 158 (1991), citing *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and to secure a person's privilege against self-incrimination by allowing a suspect to elect to converse "with the police only through counsel." *McNeil, supra* at 176. The procedural safeguards for this right to counsel adopted in *Miranda* require that the police discontinue the questioning of a suspect when a request for counsel is made. These safeguards, however, apply only when there is a custodial interrogation of a suspect. [*People v* ]*Marsack*, [231 Mich App 364,] 374[; 586 NW2d 234 (1998)]. [*Williams*, 244 Mich App at 538-539.]

In this case, defendant's statement was made before any adversarial proceedings against him began.[3] "Because adversarial proceedings had not been initiated against defendant . . . , the Sixth Amendment right to counsel is not implicated." *Id.* at 539. Rather, and as the prosecutor correctly observes, the question of suppression is solely limited to the vindication of defendant's rights under the Fifth Amendment. *Id.*

"In *Edwards v Arizona*, 451 US 477, 484; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the United States Supreme Court established the bright-line rule that an accused, having expressed a desire to deal with the police only through counsel, may not be subject to further interrogation by the authorities until counsel has been made available unless the accused initiates further communication." *People v McRae*, 469 Mich 704, 715; 678 NW2d 425 (2004). However, a request for counsel must be unequivocal. *People v Tierney*, 266 Mich App 687, 711; 703 NW2d

---

[3] Adversarial proceedings begin with a formal charge, preliminary hearing, indictment, information, or arraignment. *People v Hickman*, 470 Mich 602, 607; 684 NW2d 267 (2004). No such proceedings had been initiated against defendant at the time of his interview.

204 (2005). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v United States*, 512 US 452, 459; 114 S Ct 2350; 129 L Ed 2d 362 (1994). Whether a defendant has unequivocally invoked the right to counsel is an objective inquiry. *People v Adams*, 245 Mich App 226, 237; 627 NW2d 623 (2001), citing *Davis*, 512 US at 458. A defendant's comments must be evaluated in context. See *Adams*, 245 Mich App at 237-239 (holding that an isolated question, "Can I talk to him [a lawyer] right now?" was not an unequivocal request for counsel; when understood in context of the larger conversation between the defendant and police, this question and others were "merely inquiries into the way the process worked, not an actual demand for an attorney."). Further, even if the right is invoked, a defendant's responses to further interrogation may be admitted at trial if the defendant, after initially invoking the right to counsel, initiates contact with the police and knowingly and voluntarily waives the right previously invoked. *Smith v Illinois*, 469 US 91, 95; 105 S Ct 490; 83 L Ed 2d 488 (1984).

At the beginning of defendant's interview with Quinn and Hertel, defendant asked, "So, what, I'm being charged right now?" Quinn responded, "Yes, you are being charged. Okay. So before we even start getting into anything, I'm going to read you your Miranda rights." After being read his *Miranda*[4] rights, defendant agreed that he understood his rights. The following exchange occurred:

> *Detective Quinn*: Do you want to talk about it Al, give us your side of the story?
>
> *Defendant*: *I mean, I'd rather talk to my lawyer if you say I'm being charged.*
>
> *Detective Quinn*: Okay. And you are being charged.
>
> *Defendant*: Right now. So what I'm being charged with [sic]?
>
> *Detective Quinn*: Felony murder, conspiracy armed robbery, and armed robbery.
>
> *Defendant*: Felony murder and conspiracy.
>
> *Detective Quinn*: Mm-hmm.
>
> *Defendant*: Armed robbery and armed robbery?

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*Detective Quinn*: Right. And that's why we're trying to get your side of the story because obviously there's a lot more going on, you know, the people [sic] are pointing a finger at other people.

*Defendant*: So people are pointing fingers at me?

*Detective Quinn*: Well, there's a reason why you're being charged and you're under arrest right now. So, like I say, this is your opportunity to give us your side, but if you want an attorney I'm going to not even ask you any questions. We're going to abide by your wishes. If you want to talk to us, give us your side of the story, we'll listen. But if what you're asking for is an attorney, I'm going to abide by that and you know.

*Defendant*: Because I really want to get this cleared up.

*Detective Quinn*: So do we.

*Defendant*: And so, um, I think it's best – I don't know what's going on far as what they got going on –

*Detective Quinn*: Uh-huh.

*Defendant*: —so, therefore, I'm not going to—because I know I wasn't there.

*Detective Quinn*: Okay.

*Defendant*: So, I know where I was at.

*Detective Quinn*: Okay.

*Defendant*: *So, therefore, I'd just talk to a lawyer.*

*Detective Quinn*: Okay. All right. I'm not going to ask you any questions then. Going to abide by that. Okay. [Emphasis supplied.]

Defendant argues that the interrogation should have ceased immediately after the first emphasized statement, in which he stated he would rather talk to a lawyer if he was being charged. This was not an unequivocal invocation of the right to counsel; rather, the invocation of that right was conditioned on whether he was being charged. Objectively speaking, the statement was more of a question by defendant, asking Quinn whether he was being charged. And for the most part, the colloquy that followed, which largely consisted of questions posed by defendant and answered by Quinn, does not objectively demonstrate an unequivocal invocation of the right to counsel. *Davis*, 512 US at 459; *Adams*, 245 Mich App at 237-239.

However, we agree that the second emphasized statement—"So, therefore, I'd just talk to a lawyer[,]"—was an unequivocal request for counsel. What transpired before this statement was a discussion during which defendant seemed to be obtaining information to decide whether

-5-

to invoke the right to counsel he had previously mentioned. Thus, this statement seemed, at least in that moment, to be a final decision: that after learning exactly what charges he faced, defendant thought it best to have an attorney present before answering any questions. Quinn certainly understood it that way, responding to the statement by explaining that he would respect that decision and end the interview. Viewed objectively, this second statement was an unequivocal request for counsel. *Davis*, 512 US at 459; *Adams*, 245 Mich App at 237-239.

But after this unequivocal request for counsel, and immediately after Quinn stated that he would end the interview, defendant responded, "I would love to answer your questions." This led to the following discussion between defendant and the officers:

> *Defendant*: I would love to answer your questions.
>
> *Detective Quinn*: Sure. Well, how about this, and it never happens when everybody says they're going to, when you speak with your attorney if you want to sit down, we're still willing to listen to what you have to say. Okay. We're willing to listen, sit down with your attorney and give us your side of the story, give us an explanation. Okay. We're—that door is still open. Okay. But I'm telling you though it's been our experience everybody who walks out of here and says don't worry I'm going to talk to you, I just want to talk to my attorney first, it never happens, because everybody just don't say anything [sic]. Okay. Unfortunately, with that is you never get your opportunity to give your side of the story so the evidence we already have that just goes to the prosecutor's office and it's kind of one-sided.
>
> *Defendant*: So, what, you're saying by my not—
>
> *Detective Quinn*: No, no. I'm not trying to talk you into talking.
>
> *Defendant*: I'm just, I'm just saying by me not talking right now.
>
> *Detective Quinn*: This is your opportunity to give us your side of the story. Okay. But you've asked for an attorney, I'm going to—I'm going to—
>
> *Defendant*: I never want anything to be one-sided.
>
> *Detective Quinn*: Sure.
>
> *Defendant*: So like I say, I'm willing to talk so, I can always stop talking if I feel uncomfortable.
>
> *Detective Quinn*: Right. But you've mentioned you want an attorney, so I'm going to, you know, acknowledge your, you know, your desire, you know.
>
> *Defendant*: We can talk right now.
>
> *Detective Quinn*: You want to talk right now?

-6-

*Defendant*: Mm-hmm.

*Detective Quinn*: Like I say, I don't want to give you the impression I'll try to talk you into talking [sic]. It's got to be strictly your choice, right. You're the one that's going to have to say that I want to talk, because honestly right now you've asked for an attorney. I'm, I'm not going to ask you questions if you want an attorney. You know, you have that right and Detective Hertell [sic] and I are, you know, we'll abide by your wishes what, you know, you have rights. Okay. It's got to be, it would have to be you wanting to talk.

*Defendant*: Okay. Talk.

*Detective Hertel*: You choosing to talk?

*Defendant*: (Nodding affirmatively).

*Detective Hertel*: Okay. You have to sign this just saying that you understand the rights and you [are] willing to answer questions right now.

*Detective Quinn*: And you understand we're not trying, you know, I'm not trying to talk you into talking, you know what I mean.

*Defendant*: Right.

*Detective Quinn*: If you want your attorney, you know what I mean, that's your choice. And, you know, we'll stop right now. So, you know, it's got to be completely you're willing you want to talk [sic]; is that correct?

*Defendant*: (Nodding affirmatively).

*Detective Quinn*: Okay.

*Detective Hertel*: Your choice?

*Defendant*: Yeah.

*Detective Quinn*. Okay. All right. So now that I've told you the charges . . . . So that's why the charges are what they are. Okay.

Let's see, I'm willing, we're willing to listen to your side of the story. . . . Why don't you tell me what—how did this start that night?

In *Smith*, 469 US at 95, a case relied on by defendant, the United States Supreme Court explained that "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." This is precisely what occurred here. When defendant stated that he would "love to answer [Quinn's] questions," defendant initiated further discussion with the officers. Faced with what seemed to be an about-

face from defendant's prior position, Quinn, and to a lesser extent, Hertel, engaged in a lengthy discussion with defendant concerning whether to continue the interview. Quinn expressed his understanding that defendant had invoked the right to counsel, and asked defendant if he was now voluntarily choosing to waive that right. Defendant, on multiple occasions, stated that he now had changed his mind and wished to speak to the officers. Defendant confirmed that it was his choice to continue the interview, and that he had not been persuaded by the officers to waive his right to counsel. Defendant also expressed his recognition that he could invoke the right at any point in the interview if he felt uncomfortable. Clearly, then, after initially invoking the right to counsel, defendant (1) initiated further communication with the officers, and (2) knowingly and intelligently waived the right to counsel. Defendant's responses to the questions that followed were admissible. *Smith*, 469 US at 95.

Defendant relies on *Smith* for the premise that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 US at 100. Unlike the trial court, we accept that defendant's second statement—"So, therefore, I'd just talk to a lawyer[,]"—was an unequivocal request for counsel. In our view, the pertinent question is not whether this request was unequivocal, but rather, whether defendant then initiated further discussions with the officers, and later, knowingly and intelligently waived the right he had invoked. *Id*. at 95. Defendant's post-request statements must be considered to answer this question.

And in any event, what immediately followed defendant's invocation of the right to counsel was not an interrogation at all. "For purposes of *Miranda*, interrogation refers to express questioning or its functional equivalent." *People v Kowalski*, 230 Mich App 464, 479; 584 NW2d 613 (1998) (quotation marks omitted). The police are not barred from having any further communication whatsoever with a defendant after he or she has invoked the right to counsel under *Miranda*. Rather, officers may engage in further communications that do not amount to express questioning or statements likely to elicit an incriminating response from the defendant. See *id*. at 480-484. Relevant to the present matter, "a mere inquiry into whether an accused has changed his mind about wanting to speak without an attorney present is not considered 'interrogation' . . . ." *Id*. Although defendant had unequivocally asserted his right to counsel, his statement that he would love to speak to the officers understandably caused Quinn to question whether defendant changed his mind. It was not improper for Quinn to engage in further discussions, limited to the question whether defendant wished to speak to the officers without counsel, despite the fact that defendant had invoked the right to have an attorney present. *Id*.

After having waived the right to counsel, defendant provided his first version of events, one that was not consistent with evidence known to the officers. Upon being confronted with this evidence, defendant invoked the right to counsel a second time:

> *Defendant*: Well, I'll just wrap it [up.]
>
> *Detective Quinn*: By wrap it up you mean—
>
> *Defendant*: Wrap it up.
>
> *Detective Quinn*: What are you saying?

*Defendant*: I'll just talk to my lawyer.

*Detective Quinn*: Okay. That's okay.

*Defendant*: By the way, is there anyway [sic] I could call my mother?

*Detective Quinn*: Sure. Yeah, we'll (indiscernible) a phone call. Okay. Anything else?

*Defendant*: Let her know where I'm at. No, but I'll—what's your name again?

In his appellate brief, defendant explains that he invoked the right to counsel in the above exchange. And we certainly agree; clearly, defendant expressed his desire to end the interview and speak with counsel. But the record also clearly shows that Quinn and Hertel honored this decision. While the three men continued to speak, Quinn and Hertel did not discuss or ask any further questions of defendant regarding the crime. As the interrogation ended on defendant's invocation of his right to have an attorney present, defendant's rights under the Fifth Amendment were not violated.

Defendant next takes issue with what occurred with respect to his mother, Sennie McKinley. Defendant argues that after he invoked his right to counsel on this second occasion, police used Sennie as their agent, and relied on her religious proclivities to coerce defendant into then waiving his right to counsel and again speaking to police.[5] As defendant recognizes, "constitutional protections apply only to governmental action." *People v Anderson*, 209 Mich App 527, 533; 531 NW2d 780 (1995). Sennie is not a police officer, and thus, her conduct and actions would not generally be the subject of constitutional concerns. However, individuals that are possessed of state authority, and who purport to be acting under that authority, are considered to be acting on behalf of the government. Thus, their actions are state actions, subject to constitutional protections. *McRae*, 469 Mich at 710-711. Of course, the reverse is also true; those who are not police officers, and who are not acting in concert with or at the behest of police, are not state actors, and need not comply with constitutional safeguards that vindicate the rights granted by the Fifth Amendment. *Anderson*, 209 Mich App at 533.

Here, there is absolutely no basis to conclude that Sennie was working in concert with or at the behest of police. The impetus for Sennie's appearance at the police station derived entirely

---

[5] As background, defendant was allowed to place calls to family and request their presence at the police station. Sennie and defendant's sister, Tyra McKinney, came to speak with defendant. After speaking with Sennie and Tyra, defendant reinitiated communication with Quinn and Hertel. Quinn and Hertel again advised defendant of his *Miranda* rights, and defendant agreed to waive those rights. Defendant then spoke to Quinn and Hertel, admitting that he was with Burton at the time of the robbery, but claiming that he tried to talk Burton out of committing the crime.

from defendant's actions. Defendant requested that Sennie be contacted and allowed to visit him at the police station. Defendant himself placed the calls to his family. Sennie testified that she was not given any direction whatsoever by the officers. In fact, it is undisputed that the officers had never met or spoken with Sennie or Tyra before they came to the police station to visit with defendant. There is no basis to conclude that Sennie (or Tyra, for that matter) was acting as an agent of the police.

Defendant contends that even if Sennie was not initially acting as an agent of the officers, she later became their agent. Defendant seems to argue that because Sennie's words and conduct made it clear that she was religious, the officers must have known so, and must have then decided to use Sennie to coerce defendant into waiving his right to counsel. Defendant cites no case law, and we have found none, holding that an individual with no prior relationship with investigating officers somehow becomes an agent of the police by making overtly religious statements in the presence of those officers before being allowed to speak to the suspect. Defendant points only to Quinn's "higher calling" comment[6] as evidence that Quinn used Sennie (and Tyra, even though she was virtually silent during the conversation) as his agents. This comment was made to Sennie long after she began speaking with defendant. Further, as Quinn explained at the *Walker* hearing, this comment was no more than Quinn stating his agreement with Sennie that there is a higher calling, or in other words, that God exists. No inference can be drawn from this comment that Sennie or Tyra were working as agents of the officers.

Defendant also contends that the statements made by Sennie during their meeting coerced him into providing his statement, rendering it involuntary. Again, the constitution only protects against unlawful actions by the government. *Anderson*, 209 Mich App at 533. Because Sennie was not an agent of the government, her actions are irrelevant. Further, the evidentiary record tends to demonstrate that defendant had made his decision to speak with the officers before he spoke with his family members. And after speaking with Sennie, defendant repeatedly informed officers that he was knowingly and voluntarily waiving his right to counsel, and signed a statement to that effect, even writing, "my choice to talk" under his signature. Defendant cannot show that he was unlawfully coerced into waiving his right to counsel and giving his statement to police. As such, the trial court correctly denied defendant's motion to suppress his statements.

## B. EVIDENCE OF OTHER ARMED ROBBERIES

Defendant next argues that the trial court erred by permitting the prosecutor to present evidence of his other, prior armed robberies at trial. We disagree. "The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). An abuse of discretion occurs when the trial court reaches a decision falling outside the principled range of outcomes. *People v Norfleet*, 317 Mich App 649, 664; 897 NW2d 195 (2016). Even if evidentiary error occurred, reversal is not warranted if the error is harmless; "evidentiary error does not warrant reversal if . . . it does not affirmatively appear more probable

_____

[6] After Sennie stated that she believed in God, Quinn responded, "There's a higher calling."

than not that a different outcome would have resulted without the error." *People v Duenaz*, 306 Mich App 85, 97; 854 NW2d 531 (2014).

## 1. ROBBERIES COMMITTED IN 2000 AND 2001

The first question is whether the trial court abused its discretion by allowing the prosecutor to present evidence that defendant and Burton committed eight other armed robberies in December 2000 and January 2001. Generally speaking, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." MRE 404(a). In accordance with this general rule, MRE 404(b)(1) explains that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But the rule goes on to explain that such evidence:

> may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior to or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

In addition, before evidence may be admitted in a criminal case under this rule, "The prosecution . . . shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce and the rationale . . . for admitting the evidence." MRE 404(b)(2).

With respect to the crimes committed in 2000 and 2001, there is no dispute that the prosecutor complied with MRE 404(b)(2). Rather, defendant's focus is on whether the evidence was admitted for a proper purpose under MRE 404(b)(1). It was. "Before other-acts evidence may be introduced, the prosecution must satisfy a three-part test: (a) there must be a reason for its admission other than to show character or propensity, (b) it must be relevant, and (c) the danger of undue prejudice cannot substantially outweigh its probative value, especially if there are other means of proof." *People v McGhee*, 268 Mich App 600, 609-610; 709 NW2d 595 (2005), citing *People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000).

"Evidence is relevant when it has a tendency to make a material fact more or less probable." *McGhee*, 268 Mich App at 610. "Relevance involves two elements, materiality and probative value. Materiality refers to whether the fact was truly at issue." *Id*. "The probative force inquiry asks whether the proffered evidence tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Crawford*, 458 Mich 376, 389-390; 582 NW2d 785 (1998) (quotation marks and citation omitted). "The threshold is minimal: any tendency is sufficient to prove probative force." *Id*. at 390 (quotation marks and citations omitted). "In the context of prior acts evidence, however, MRE 404(b) stands as a sentinel at the gate: the proffered evidence truly must be probative of something *other* than the defendant's propensity to commit the crime." *Id*. "If the prosecutor fails to weave a logical thread linking the prior act to the ultimate inference, the evidence must be excluded, notwithstanding its logical relevance to character." *Id*.

To defend against the charges levied against him, defendant argued that he did not intend for the robbery to occur, and instead, was merely present when Burton entered Bernie's Market and killed its owner. By pursuing this defense, defendant made his intent the primary focus of the trial. See *People v Moldenhauer*, 210 Mich App 158, 160; 533 NW2d 9 (1995) (explaining that the "mere presence" defense "implies not only an absence of criminal intent but also passivity and nonparticipation in the actual commission of the crime."). And as the trial court found, evidence that defendant had engaged in eight similar robberies was clearly probative, in that it tended to show that defendant was not merely present, as he argued, but in fact, had planned to commit the robbery with Burton and intended for the robbery to occur. "The more often a defendant acts in a particular manner, the less likely it is that the defendant acted accidentally or innocently, and conversely, the more likely it is that the defendant's act is intentional." *McGhee*, 268 Mich App at 611. Indeed, given the substantial similarities between the prior crimes and the robbery of Bernie's Market, the incidents were likely more probative than is generally necessary to admit the prior acts as evidence of defendant's intent. See *id*. at 611 ("Where other-acts evidence is offered to show intent, the acts must only be of the same general category to be relevant.").

As he did in the trial court, defendant largely argues that the prior crimes were too remote in time to be relevant. He cites no authority in support of this contention. That is likely because Michigan law holds the opposite. In *McGhee*, this Court explained:

> Although six years had passed between the two incidents, this Court has found that a 20-year gap between a prior incident and a charged offense was insufficient to dispel the probative value when the similarity of the acts indicated the defendant's scheme. *People v Knapp*, 244 Mich App 361, 380; 624 NW2d 227 (2001). The remoteness of an act only affects the weight of the evidence rather than its admissibility. [*McGhee*, 268 Mich App at 611-612.]

Defendant also briefly argues that the admission of evidence of these prior crimes was improper because the probative value of the evidence was substantially outweighed by the risk of undue prejudice. However, defendant only explains that "the amount of time taken in the admission of eight prior acts, the shifting of the jury's focus from the present to the past, would have confused any jury." It is true that otherwise relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. However, we are not swayed by defendant's argument. We do not see how the discussion of prior acts would have confused any jury. If that were true as a general matter, no evidence of prior crimes could ever be admitted under MRE 404(b). We are confident that the jury would not be confused or unduly distracted by the discussion of prior crimes committed by defendant, particularly in light of the trial court's instructions regarding how to consider the evidence. "It is presumed that the jurors followed that instruction." *People v Bass*, 317 Mich App 241, 263; 893 NW2d 140 (2016). Defendant's argument lacks merit.

## 2. "CASH ADVANCE" ROBBERY

Second, defendant contends that the trial court abused its discretion by permitting the prosecutor to admit evidence that defendant, Burton, and a third man committed a similar armed robbery of a "Cash Advance" store just a month or two before the robbery of Bernie's Market. Evidence of this robbery came from defendant himself. During his interview with Quinn and Hertel, defendant stated that he and the other men committed this particular robbery. The trial court concluded that defendant's statements concerning his past acts were not admissible under MRE 402(b) due to a lack of notice but that they were admissible under MRE 801(d)(2) which provides that a statement by a party defendant is not hearsay. This was error. The fact that a statement is not hearsay does not immunize it from the other rules of evidence. Here, the statement was introduced to describe prior bad acts and so is subject to MRE 404(b) and the notice requirements. However, as explained in People v Jackson, 498 Mich 246; 869 NW2d 253 (2015), such an error is subject to a harmless error analysis. The Jackson Court explained:

> [W]hile it was error for the prosecution not to provide, and the trial court not to require, "reasonable notice" of Price's testimony under MRE 404(b)(2), the defendant has not demonstrated that this error "more probably than not . . . was outcome determinative." [*People v* ]*Douglas*, 496 Mich [557,] 566[; 852 NW2d 587 (2014)] (quotation marks omitted). As discussed above, the lack of proper pretrial notice did not result in the admission of substantively improper other-acts evidence. Thus, although the defendant was not afforded his due "opportunity to marshal arguments" against its admission before it was introduced at trial, [*People v* ]*VanderVliet*, 444 Mich [52,] 89 n 51[; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994)], he has not shown that any such arguments would have been availing, or would have affected the scope of testimony ultimately presented to the jury. Furthermore, while the defendant suffered "unfair surprise" from the unexpected introduction of this testimony at trial, *id.*, he was admittedly aware of Price's general version of events before trial, including her and Newsome's prior relationships with the defendant, and he has not demonstrated how he would have approached trial or presented his defense differently had he known in advance that Price would be permitted to testify as she did. For instance, the defendant has not suggested that he would have chosen to explore these prior relationships in greater depth with Price, nor has he identified or presented offers of proof from any witnesses he might have called in response to her testimony. He also has not suggested that he would have altered or abandoned his theory of fabrication so as to prevent Price from offering this testimony to counter it. We therefore cannot conclude that the defendant suffered outcome-determinative prejudice from the prosecution's failure to follow, and the trial court's failure to apply, MRE 404(b)(2). [*Jackson*, 498 Mich at 278-279.]

The present matter presents a very similar scenario. First, the evidence was clearly admissible under MRE 404(b)(1). Defendant's statement attempted to suggest he was not really a willing participant in the armed robbery and that he did not want his colleague to proceed with it. His participation in these recent armed robberies with the same other perpetrator demonstrated his willingness to aid what he knew was an armed robbery. Second, defendant has

not explained how knowing that this evidence would be admitted would have changed his trial strategy in any way. Moreover, given his confession, it is difficult to see how this admission, even if error, could have created "outcome-determinative prejudice."

## C. JURY INSTRUCTIONS

Finally, defendant argues that the trial court erred when it refused to instruct the jury regarding the offense of accessory after the fact, as was requested by defendant. Defendant also contends that this omission deprived him of his constitutional right to present a defense. We disagree.

When preserved, "This Court reviews claims of instructional error de novo." *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). However, while defendant preserved his claim of instructional error below, he did not contend that the failure to provide the requested instruction denied him the right to present a defense. Thus, his constitutional claim is not preserved. See *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004) (explaining that, as a general matter, "an issue is unpreserved if it is not properly raised before the trial court."). "Unpreserved constitutional issues are reviewed for plain error that affected a defendant's substantial rights." *Id*. at 160. To establish plain error requiring reversal, defendant must demonstrate that an error occurred, that "the error was plain, i.e., clear or obvious," and that "the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even if defendant satisfies these requirements, this Court "must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, brackets, and citation omitted).

Defendant argues that by refusing to give an instruction regarding the crime of accessory after the fact, the trial court committed instructional error, and further, deprived him of a substantial defense. But as defendant acknowledges, accessory after the fact is not a defense at all; rather, it is a separate offense. *People v Perry*, 460 Mich 55, 56, 59-60; 594 NW2d 477 (1999). And as defendant likewise acknowledges, he was not charged by the prosecutor as being an accessory after the fact in this case. "[A] defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense; that is, the offense must be committed as part of the greater offense insofar as it would be impossible to commit the greater offense without first committing the lesser offense." *People v Jones*, 497 Mich 155, 164; 860 NW2d 112 (2014) (quotation marks and citation omitted). "[T]he rule of lesser included offenses is simple: pursuant to MCL 768.32(1), the court must first determine whether an offense is necessarily included, which requires a comparison of the elements of the offenses, and if so, the court must then determine whether an instruction is warranted on the facts of a particular case by examining whether the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support the instruction." *Id*. at 164-165 (quotation marks, brackets, and citation omitted).

As defendant correctly notes, our Supreme Court has held that accessory after the fact is not a necessarily included offense of murder. *Perry*, 460 Mich at 62. The only remaining question is whether accessory after the fact could be considered a lesser included offense of

either armed robbery or conspiracy to commit armed robbery. As defendant himself concedes, accessory after the fact is not a lesser included offense of armed robbery. Simply comparing the elements of the two crimes shows that it is certainly possible to commit an armed robbery without first committing the crime of accessory after the fact. "The essential elements of armed robbery are (1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute." *People v Henry (After Remand)*, 305 Mich App 127, 142-143; 854 NW2d 114 (2014) (quotation omitted). "An accessory after the fact . . . is one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment." *People v Lucas*, 402 Mich 302, 304; 262 NW2d 662 (1978) (quotation marks and citation omitted). It is clearly possible to commit the crime of armed robbery without also committing the crime of accessory after the fact; the crimes do not share even one common element. Accordingly, accessory after the fact is not a lesser included offense of armed robbery. *Jones*, 497 Mich at 164.

The same is true when one compares accessory after the fact to the crime of conspiracy to commit armed robbery. A conspiracy is committed when any person "conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner . . . ." MCL 750.157a. "The 'gist' of conspiracy 'lies in the illegal agreement'; once the agreement is formed, the 'crime is complete.' " *People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (citations omitted). "Michigan law requires no proof of an overt act taken in furtherance of the conspiracy. And, because the crime is complete upon the conspirators' agreement, the prosecution need not prove that 'the purpose contemplated by the unlawful agreement was accomplished.' " *Id*. (citation omitted). Again, there is absolutely no overlap between the elements of accessory after the fact and conspiracy. Thus, accessory after the fact is clearly not a lesser included offense of conspiracy to commit armed robbery. *Jones*, 497 Mich at 164. Because accessory after the fact is not a lesser included offense of any of the crimes defendant was charged with, the trial court correctly rejected defendant's request for an instruction on the separate crime of accessory after the fact.[7]

Defendant nonetheless maintains that the trial court should have read the instruction and that the failure to do so deprived defendant of a defense. In *Perry*, our Supreme Court was faced with a similar situation. There, the defendant was charged with murder, and although he was not charged as being an accessory after the fact, requested an instruction on that offense as well.

---

[7] Perhaps a simpler way to look at the crimes is in terms of the timeline of events in this case. Defendant committed the crime of conspiracy when he agreed with Burton to commit the robbery. Then, defendant and Burton actually followed through on this plan, committing the robbery and murder. After the robbery and murder were committed, defendant may well have committed another crime, that of being an accessory after the fact, by rendering assistance to Burton in an effort to avoid detection or arrest. Each of these three steps, however, is its own distinct criminal act; each could have been committed on its own. The prosecutor simply decided not to charge defendant with the crime he may have committed in the third and final step of the process.

*Perry*, 460 Mich at 56. The trial court refused to instruct the jury on the offense of accessory after the fact. *Id.* Our Supreme Court first held that accessory after the fact is not a lesser included offense of murder. *Id*. at 62. The Court then rejected the notion that the instruction would be warranted simply because the evidence would have supported a conviction on a charge of being an accessory after the fact. *Id*. at 63-64. Responding to a dissenting judge of this Court, our Supreme Court explained:

> Writing in dissent, Judge BANDSTRA focused on the evidentiary support in this record for the conclusion that defendant was, indeed, an accessory after the fact. In this vein, he correctly noted that a jury is free to believe or disbelieve, in whole or in part, any of the evidence presented. *People v Fuller*, 395 Mich 451, 453; 236 NW2d 58 (1975). However, evidentiary support for a cognate instruction is not alone sufficient to require that the instruction be given. As explained in [*People v* ]*Hendricks*[, 446 Mich 435; 521 NW2d 546 (1994)] and [*People v* ]*Bailey*[, 451 Mich 657; 549 NW2d 325 (1996) amended, reh den 453 Mich 1204 (1996)], the putative cognate offense also must be of the same class or category. Thus, while Judge BANDSTRA is correct that "[i]f defendant had been originally charged as an accessory after the fact in this case, the evidence adduced at trial would clearly have supported a guilty verdict with regard to that charge," it does not follow that "[d]efendant was entitled to the requested instruction regarding accessory after the fact, and the trial court erred in failing to grant that request." [*People v Perry*,] 218 Mich App [520, 551-552; 554 NW2d 362 (1996) (BANDSTRA, J., dissenting)]. [*Perry*, 460 Mich at 63-64.]

It is certainly true that where the evidence supports a particular theory or defense, and the defense requests an instruction on that theory or defense, the instruction must be given. *People v Rodriguez*, 463 Mich 466, 472-473; 620 NW2d 13 (2000). But what defendant requested was an instruction not on a theory or defense, but rather, on a crime that he was not charged with having committed. Defendant is entitled to an instruction on a particular offense only if *two* requirements are satisfied: (1) the evidence rationally supports a conclusion that the offense was committed, and (2) the offense is a lesser included offense of one charged by the prosecutor. *Jones*, 497 Mich at 164-165. Defendant requested an instruction on an *offense* that, while perhaps rationally supported by the evidence, is not a lesser included offense of any crime charged by the prosecutor. Thus, as was the case in *Perry*, defendant was not entitled to have the jury instructed on the offense of accessory after the fact. *Id*.; *Perry*, 460 Mich at 63-64.

Further, defendant was not deprived of a substantial defense. As explained, defendant was charged with murder, armed robbery, and conspiracy to commit armed robbery. He was free to, and did, defend against these charges. What he was not free to do was to force the prosecutor to charge him with other, lesser offenses that he may have also committed, and then hope that the jury might choose to convict him only of the lesser offense or offenses as a matter of leniency. "It is axiomatic that the power to determine whether to charge a defendant and what charge should be brought is an executive power, which vests *exclusively* in the prosecutor." *People v Smith*, 496 Mich 133, 141; 852 NW2d 127 (2014). "Prosecutors have broad discretion in deciding under which statute they will prosecute a defendant, even if more than one statute is

applicable." *People v Hall*, 499 Mich 446, 453; 884 NW2d 561 (2016). And where crimes are distinct, "a prosecutor does not abuse his discretion by charging the greater offense." *Id*. at 460.

Affirmed.

/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Douglas B. Shapiro