Corrigan, C.J.
In this case we must determine whether the admission of statements made by defendant to a sheriffs reserve deputy violated defendant’s Sixth Amendment rights. We conclude that the admis *707 sion of the statements did violate defendant’s Sixth Amendment rights because, under the circumstances in this case, the reserve deputy was a state actor at the time he questioned defendant, who had not waived his Sixth Amendment right to counsel. We have already concluded that such an error would not be harmless beyond a reasonable doubt;[1] therefore, we reverse the decision of the Court of Appeals and remand for a new trial.
I. FACTUAL HISTORY AND PROCEDURAL POSTURE
Defendant was charged with first-degree murder after the remains of fifteen-year-old Randy Laufer were found on the grounds of defendant’s previous residence. After defendant was arrested, he received his Miranda[2] warnings and invoked both his Fifth Amendment right to be free from compelled self-incrimination and his Sixth Amendment right to counsel. After arraignment, while defendant was in custody awaiting trial, defendant apparently requested to speak to an old neighbor, Dean Heintzelman. It had been ten years since defendant had seen Heintzelman, and defendant was unaware that Heintzelman had become a reserve police officer. Further, defendant was unaware that both Heintzelman and Heintzelman’s son were part of the police team present at the scene when Randy Laufer’s body was recovered.
Heintzelman visited defendant after he finished his shift as a reserve deputy. Before visiting defendant, Heintzelman asked the permission of one of the corrections officers to do so. Heintzelman was in full *708 uniform, complete with badge. Although it was some time after eleven o’clock at night, Heintzelman was allowed to go directly to defendant’s maximum security cell. Heintzelman later testified that he had the following conversation with defendant:
Well, first we just started talkin’, talkin’ about - shook hands and everything, you know, like I hadn’t seen him in a long, long time. ... I asked him about his boy, Marty, ‘cuz his boy Marty is the same age as my son. ... I told him, I said, “Well, Marty’s in here from what I understand, too.”[3] And then he showed me pictures of Marty’s wife and his baby, and we carried on a conversation, like you or I would.
And then I said - I asked John - I said, “John, did you do what you’re charged with here?” And he didn’t answer me. So we just went talkin’ again about, well, more or less about Marty again. And I said, “Well, you know, they think Mariy had something to do with that, you know, with Randy.” And he says, “Well, if they try to pin it on Marty, I’ll let ‘em fry my ass.” And that was his words.
I said, “John, did you do it?” And he just hung his head down and said, “Dean, it was bad. It was bad.” That’s - we didn’t discuss it any more.
After questioning defendant about the charges, Heintzelman reported the discussion to Lieutenant McClellan, who was the officer in charge of the Laufer investigation scene. Heintzelman then volunteered to go back and talk to defendant if McClellan requested. Heintzelman was not permitted to speak with defendant again.
Defendant moved to suppress Heintzelman’s testimony regarding defendant’s statements because the alleged statements were obtained in violation of *709 defendant’s right to counsel and because defendant was not given Miranda warnings again before questioning. After an evidentiary hearing, the trial court denied defendant’s motion to suppress on the ground that defendant had initiated the conversation. After defendant was convicted by a jury of first-degree murder, he challenged on appeal the admission of the statements.[4] The Court of Appeals did not determine if there was error, ruling instead that, even if the admission were error, it was harmless beyond a reasonable doubt.[5]
Upon defendant’s first application for leave to appeal, this Court determined that if the admission of the statement were error, such error would not be harmless beyond a reasonable doubt. This Court vacated the Court of Appeals judgment in part and remanded the case for reconsideration of defendant’s claim of error.[6]
On remand, the Court of Appeals held that the trial court did not err in admitting this evidence, because “the statement at issue was made in the context of a conversation between former friends, which, as the trial court in this case found, was initiated by the defendant.”[7]
Defendant again appealed to this Court, and we granted leave, directing the parties to address: “(1) whether defendant’s statements to Officer Heintzelman constituted the interaction of custody and offi *710 cial interrogation, as discussed in Illinois v Perkins, 496 US 292 [110 S Ct 2394; 110 L Ed 2d 243] (1990), and (2) whether Officer Heintzelman was a state actor at the time defendant made the statements to him.” 468 Mich 921 (2003).
II. STANDARD OF REVIEW
In order to determine whether a constitutional error occurred, we must first determine whether Heintzelman was a state actor, which is a mixed question of fact and law. We review for clear error a lower court’s findings of fact, MCR 2.613(C), and review de novo questions of law. People v Herron, 464 Mich 593, 599; 628 NW2d 528 (2001).
III. DISCUSSION
A. STATE ACTOR ANALYSIS
The people argue that Heintzelman was not a state actor because he did not visit defendant in an official police capacity, but was invited to visit defendant as a former neighbor and friend. That defendant was unaware of Heintzelman’s reserve deputy status when he asked to see him, however, does not end the inquiry.
In Griffin v Maryland, 378 US 130, 135; 84 S Ct 1770; 12 L Ed 2d 754 (1964), the Supreme Court held that “[i]f an individual is possessed of state authority and puiports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took *711 was not authorized by state law.”[8] It is clear from the *712 record that Heintzelman possessed actual state authority—he was deputized as a Clare County sheriffs reserve deputy. The dispositive question, then, is whether Heintzelman pmported to act under that authority.
The word “purport” means: “1. to present, esp. deliberately, the appearance of being; profess or claim .... 2. to convey, express or imply.” Random House Webster’s College Dictionary (2d ed). The record evidence shows that Heintzelman visited defendant in his full uniform, thus creating the appearance that he was a state actor. Further, Heintzelman received permission from a corrections officer to visit defendant late at night in his maximum-security cell. The people conceded at oral argument that an ordinary citizen would not have been granted permission under the same circumstances. Thus, it was only *713 by virtue of his status as a reserve deputy that Heintzelman was granted direct access to defendant’s maximum-security cell, a restricted area where only governmental agents are normally allowed to tread. Further, this access was granted late at night, a time when ordinary citizens are prohibited from visiting inmates.[9]
There is no evidence that Heintzelman sought to distance himself from his actual or apparent police authority. Instead, defendant was questioned in the middle of the night by a sheriff’s reserve deputy (albeit one he had known a decade earlier) in full uniform. Indeed, Heintzelman’s actions during and after the questioning only reinforced his actual or apparent authority. During his “conversation” with defendant, Heintzelman twice brought up the subject of defendant’s son in an apparent attempt to get defendant to answer Heintzelman’s questions. Further, after he spoke to defendant, Heintzelman contacted the lieutenant in charge of the investigation, relayed the contents of the conversation, and offered to obtain more information. Finally, it is also telling that Heintzelman was not allowed any further contact with defendant for fear of violating defendant’s Sixth Amendment rights.
The facts of this case distinguish it from United States v Gaddy, 894 F2d 1307 (CA 11, 1990), cited by the dissent. In Gaddy, the defendant’s aunt was a police officer. Through her position as an officer, she *714 learned that the defendant was in custody. A detective advised the aunt that it would be in her nephew’s best interest to cooperate, but did not request that the aunt talk to the nephew. The aunt contacted the nephew from her home and encouraged him to speak. He agreed and spoke to officials after waiving his Fifth Amendment and Sixth Amendment rights.
In determining that the aunt was not a state actor, the court noted that the aunt was not part of the investigative team on the defendant’s case and acted solely out of concern for his welfare. Id. at 1311. In contrast, here Heintzelman was part of the police team present for the recovery of the victim’s body from defendant’s former residence. Further, it cannot be said that Heintzelman was acting solely out of a concern for defendant’s welfare. He had not seen or spoken to defendant in ten years, and, upon reporting the conversation to his superior, volunteered to obtain more information from defendant. Thus, the lack of any close relationship between Heintzelman and defendant, along with Heintzelman’s actions after speaking to defendant, distinguish this case from Gaddy.[10]
Taken together, the evidence shows that Heintzelman was possessed of state authority and purported *715 to act under that authority. Therefore, under Griffin, his action is state action.
B. SIXTH AMENDMENT ANALYSIS
The next issue is whether Heintzelman’s questioning of defendant violated the Sixth Amendment guarantee of the right to counsel. In Edwards v Arizona, 451 US 477, 484; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the United States Supreme Court established the bright-line rule that an accused, having expressed a desire to deal with the police only through counsel, may not be subject to further interrogation by the authorities until counsel has been made available unless the accused initiates further communication. The initiation of a conversation related to the investigation, standing alone, is insufficient to establish a waiver of the previously asserted right to counsel. We incorporated the Edwards rule in People v Paintman, 412 Mich 518; 315 NW2d 418 (1982), and the Edwards rule was extended to Sixth Amendment claims in Michigan v Jackson, 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986).
It is important to note that the Sixth Amendment may be violated by questioning that does not rise to the level of the custodial interrogation required under the Fifth Amendment. In Fellers v United States, 540 US _; 124 S Ct 1019; 157 L Ed 2d 1016 (2004), a unanimous Supreme Court clarified that “an accused is denied ‘the basic protections’ of the Sixth Amendment ‘when there [is] used against him at his trial evidence of his own. incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of counsel.’ ” Id. at __, citing Massiah v United States, 377 US 201, 206; *716 84 S Ct 1199; 12 L Ed 2d 246 (1964). The Court continued: “We have consistently applied the deliberate-elicitation standard in subsequent Sixth Amendment cases . . . and we have expressly distinguished this standard from the Fifth Amendment custodial-interrogation standard . . . .’’Id. This is consistent with the Court’s holding in Michigan v Jackson, supra at 632 n 5, that the Sixth Amendment provides a right to counsel even when there is no interrogation and no Fifth Amendment applicability.
Even under Edwards, however, the initiation of any verbal exchange with governmental agents is insufficient to permit further questioning. In Oregon v Bradshaw, 462 US 1039; 103 S Ct 2830; 77 L Ed 2d 405 (1983), a four-justice plurality ruled that communications were “initiated” for purposes of the Edwards rule by conversation that “represents] a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.” Id. at 1045. The dissenting justices would have defined “initiation” even more narrowly as a communication or dialog about the subject matter of the investigation. Pursuant to Bradshaw, the defendant must initiate communication concerning the investigation in order to avoid running afoul of the rule articulated in Edwards,[11]
We hold that Heintzelman’s questioning of defendant violated the Edwards rule, as clarified in Brad *717 shaw,[12] Even solely reviewing Heintzelman’s testimony regarding his conversation with defendant, there is no proof evincing a desire on the part of defendant to pursue a discussion relating directly or indirectly to the investigation. Defendant merely initiated a social visit with his old friend and neighbor. It was Heintzelman, not defendant, who initiated all questioning relating to the investigation and charges against defendant for the murder of Randy Laufer.
In fact, Heintzelman testified that he tried at least four separate times to initiate questioning regarding the investigation: (1) he initially volunteered that defendant’s son was also incarcerated, but defendant did not respond; (2) Heintzelman expressly asked defendant if he did what he was charged with, and again defendant did not respond; (3) Heintzelman told defendant that the police thought defendant’s son was involved in the murder, at which point defendant responded that “if they try to pin it on [my son], I’ll let 'em fry my ass”; and (4) Heintzelman again expressly asked defendant if he committed the murder, and defendant responded “Dean, it was bad. It was bad.” Thus, not only did defendant not demonstrate any desire to talk about the subject of the investigation, he failed or refused to answer Heintzelman’s first two questions regarding the murder. It was only when Heintzelman continued to press defendant that defendant finally answered. Because defendant did not demonstrate a desire to discuss matters directly or indirectly related to the investigation, *718 Heintzelman’s questioning was in violation of defendant’s Sixth Amendment rights.[13]
CONCLUSION
We hold that Heintzelman was a state actor and deliberately elicited incriminating statements from defendant in violation of the bright-line rule, established in Edwards and clarified in Bradshaw, that protects a defendant against any subsequent government-initiated questioning following the exercise of the defendant’s Sixth Amendment rights. Heintzelman both possessed actual state authority and purported to act under that authority; therefore, his action is considered state action. Although defendant may have asked to speak with Heintzelman, at no point did defendant express a desire to discuss subjects directly or indirectly related to the investigation. Therefore, defendant’s statements in response to Heintzelman’s questioning regarding the murder should not have been admitted at trial. We have already determined that the error was not harmless beyond a reasonable doubt; therefore, we reverse the decision of the Court of Appeals and remand for a new trial.
Cavanagh, Kelly, Taylor, and Young, JJ., concurred with Corrigan, C.J.

 465 Mich 874 (2001).

 Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

3 Defendant’s son had been held as an accessory to the murder.

 Defendant also raised two other issues that are not before this Court.

 Unpublished opinion per curiam, issued January 12, 2001 (Docket No. 217052).

 465 Mich 874 (2001).

 Unpublished opinion per curiam, on remand, issued February 12, 2002 (Docket No 217052), slip op at 5.

 Although we agree with the dissent that not every act performed by someone who happens to be a police officer constitutes state action, it must be noted that the cases cited by the dissent in support can be distinguished from this case.
Only one case, United States v McGreevy, 652 F2d 849 (CA 9, 1981), involves a constitutional challenge. In McGreevy, the defendant alleged a Fourth Amendment violation because the Federal Express worker who searched his package also happened to be a police officer. The court rejected the Fourth Amendment claim on the ground that the FedEx worker was not acting under color of state law when he opened the package. The court noted that the worker did not obtain his FedEx job as a result of being a police officer and “carefully separated” the two jobs. Id. at 851. The same cannot be said for Heintzelman. At the time he questioned defendant, Heintzelman was present at defendant’s maximum-security cell at 11:30 p.m. by virtue of his status as a sheriff’s reserve deputy. He did nothing to “carefully separate” himself from his apparent authority.
The remaining cases cited by the dissent are civil claims brought under 42 USC 1983. The dissent does not explain why these civil cases, predicated on federal statute, should be dispositive for puiposes of constitutional claims. Although the United States Supreme Court has held that conduct that is state action for constitutional purposes is action “under color of state law” for § 1983 puiposes, it has never held that the opposite is true. In other words, conduct that fails to constitute action “under color of state law” for § 1983 purposes does not necessarily fail to represent state action for constitutional puiposes. In Nat’l Collegiate Athletic Ass’n v Tarkanian, 488 US 179, 182 n 4; 109 S Ct 454; 102 L Ed 2d 469 (1988), the United States Supreme Court merely stated that in that case, in which the plaintiff claimed he had been deprived of his Fourteenth Amendment due process rights in violation of § 1983, “the under-color-of-law requirement of 42 U.S.C. § 1983 and the state-action requirement of the Fourteenth Amendment are equivalent.” We read the footnote as merely setting forth the unremarkable conclusion that, for Fourteenth Amendment violations premised on violations of § 1983, the two state-action inquiries are equivalent. This case, however, involves a very different inquiry.
The other § 1983 cases cited by the dissent can be similarly distinguished. In Barna v Perth Amboy, 42 F3d 809 (CA 3, 1994), the plaintiffs brought a civil action under 42 USC 1983 as a result of an alleged assault by the defendant police officers. The assault occurred when one of the off-duty police officers thought he saw one of the plaintiffs strike his sister and intervened. The court held that this initial altercation was a family dispute and that the off-duty officers were therefore not acting under color of state law. Id. at 815. Because of the personal nature of the dispute, the court concluded that the use of the police-issued night stick in the fight, although objective indicia of police authority, did not transform the personal family dispute into an action taken under color of state law.
*712 Bosignore v City of New York, 683 F2d 635 (CA 2, 1982), involved an off-duty police officer who used his police-issued revolver to shoot his wife and then commit suicide. The wife survived and attempted to bring a claim under 42 USC 1983. The court rebuffed her attempt, stating simply that the officer was not acting under color of state law since his actions in shooting his wife and committing suicide were not committed in the performance of any actual or pretended duty, but were personal pursuits. Id. at 638-639.
In Delcambre v Delcambre, 635 F2d 407 (CA 5, 1981), the plaintiff was assaulted by her brother-in-law, who also happened to be the police chief. The plaintiff’s § 1983 action was dismissed because the Court found that the altercation arose out of family and political matters and that the plaintiff was neither arrested nor threatened with arrest. Under the circumstances, the court found that the family and political dispute was not conducted under color of state law. Id. at 408.
All the above cases involved truly personal matters. The same cannot be said here. It was only by virtue of his position as a governmental agent that Heintzelman was able to question defendant at the location and time he did. Further, given the decade that had lapsed without any contact between the two and Heintzelman’s subsequent offer to Lieutenant McClellan to obtain more information, any claims that Heintzelman was solely acting out of concern for defendant’s welfare are suspect.

 Again, we stress that Heintzelman’s visit to defendant at his maximum-security cell at 11:30 p.m. is significant not because it somehow means Heintzelman tried to “catch defendant off guard” as suggested by the dissent, but because only governmental agents were allowed access to maximum-security cells, particularly at that time of night.

 Similarly, the facts of this case distinguish it from Cook v Georgia, 207 Ga 820; 514 SE2d 657 (1999). First, although the defendant’s father in Cook was an FBI agent, the fbi was not exercising jurisdiction over the case—it was purely a state matter. In contrast, here Heintzelman was not only a part of the police team present at the recovery of the victim’s body, but was a part of the agency that had jurisdiction over the case. Farther, it cannot be contended that Heintzelman’s relationship with defendant, whom he had not seen or spoken to in a decade, is akin to that of a father and son.

 Further, even if a defendant initiates a conversation related to the investigation, the state must still establish that the defendant made a voluntary, knowing, and intelligent waiver of his right to have counsel present at questioning under the totality of the circumstances. Bradshaw at 1046.

 Indeed, the people conceded at oral argument that if Heintzelman was a state actor, the admission of defendant’s statements to Heintzelman violated defendant’s Sixth Amendment rights.

 We clarify that we do not hold, as the dissent suggests, that a sheriffs reserve deputy may never ask a Mend about a crime without running afoul of the Sixth Amendment. Rather, we hold only that if, at the time of the questioning, that sheriffs reserve deputy is a state actor and questions the defendant in violation of the Edwards rule as clarified in Bradshaw, that questioning violates the Sixth Amendment.