*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHARLES EDWARD PICKETT, JR.,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2019

No. 344436
Kalamazoo Circuit Court
LC No. 2016-000774-FC

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Charles Pickett, Jr., appeals as of right his jury convictions for five counts of second-degree murder, MCL 750.317; five counts of operating a motor vehicle while intoxicated causing death (OWI-death), MCL 257.625(4)(a); and four counts of operating a motor vehicle while intoxicated causing serious impairment (OWI-serious impairment), MCL 257.625(5). The trial court sentenced Pickett to 35 to 55 years' imprisonment for each second-degree murder conviction, with the sentences running concurrently; 8 to 15 years' imprisonment for each OWI-death conviction, with each sentence running concurrently with the second-degree murder offenses but consecutive to one another; and 3 to 5 years' imprisonment for each OWI-serious impairment conviction, with each sentence running concurrently to all of the other convictions. Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

On June 7, 2016, at around 6:00 p.m., the bicycling organization Chain Gang met for their scheduled evening ride. Jennifer Johnson, the ride leader for the evening, led a group of nine bicyclists along a route that they had cycled several times before. Paul Runnels, another of the cyclists, heard members of the group announce "car back," a phrase used to alert the members of the group that a vehicle was approaching from behind. The vehicle approaching was a pickup truck being erratically driven by Pickett. Moving at approximately 58 miles per hour in the 35 mile per hour zone, and without braking, Pickett crashed into the group of cyclists, killing Tony Nelson, Suzanne Sipple, Deb Bradley, Larry Paulik, and Melissa Fevig-Hughes, and severely injuring Johnson, Runnels, Paul Goble, and Sheila Jeske.

Pickett was arrested at the scene and, because he was "out of it" and appeared to be under the influence of something, he was taken to the hospital. He tested positive for amphetamine, methamphetamine, hydrocodone, and tramadol, and a witness testified before the crash she saw Pickett swallow a "pool of pills." He then stated that he would just as soon be dead before driving away by "burnin' his tires." A laboratory doctor for the Michigan State Police Toxicology Laboratory testified that Pickett's level of methamphetamine was above therapeutic levels and, in any case, it was extremely rare to have a prescription for methamphetamine. She explained how methamphetamine use, as a stimulant, could result in increased heart rate, blood pressure, agitation, excitement, impulsivity, and recklessness. Ultimately, she opined that the combined use of tramadol, cyclobenzaprine, and methamphetamine would likely result in "difficulty processing what's going [on] around you."

Other witnesses testified that before the crash, they observed or were endangered by Pickett's driving. One witness recounted hearing someone scream "watch out," so he jumped back and was able to avoid being hit by Pickett. This witness saw Picket crash into the cyclists. Another witness stated that Pickett tailgated him, swerving back and forth, and then passed him on the shoulder of the road; he added that Pickett's truck was close enough that he could have reached out the window and touched it. A third witness testified that he saw Pickett's truck remain at a green light for possibly half a minute before it sped up abruptly and almost drifted off the road because two of its tires went over a curb. A fourth witness observed Pickett driving erratically, crossing over both lanes, hitting the curb, and disrupting traffic. When that witness tried to get Pickett's license plate number, Pickett sped through the parking lot of a daycare to avoid him. A fifth witness testified that Pickett nearly rear-ended him, and he recounted that he could see leaves and sticks in the truck's grill. A sixth witness recalled that Pickett had driven onto his front yard, knocking over a bicycle chained to a tree and leaving tire marks on his driveway and yard. Finally, another witness testified that she saw Pickett drive across a sidewalk and crash into a sign before coming to a rest next to the driveway of Kalamazoo Central High School. She related that the vehicle stayed there for about 5 minutes, and she stated that Pickett "looked very disoriented" "was very fluidly moving, bobbing up and down," and "just seemed very disoriented and very confused." Although multiple witnesses called 9-1-1, Pickett sped into the group of unsuspecting bicyclists, killing five and seriously injuring four others before he could be apprehended.

## II. SUPPRESSION OF PICKETT'S CONFESSION

### A. STANDARD OF REVIEW

Pickett argues that the trial court erred by admitting into evidence a confession that was obtained in violation of his constitutional rights. A trial court's decision to not suppress a defendant's confession is reviewed de novo. *People v Barbarich (On Remand)*, 291 Mich App 468, 471; 807 NW2d 56 (2011).

> However, we review its factual findings for clear error. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. We overstep our review function if we substitute our own judgment for that of the

trial court and make independent findings. [*Id*. (quotation marks and citations omitted).]

## B. ANALYSIS

In *People v Kowalski*, 230 Mich App 464, 472; 584 NW2d 613 (1998), this Court explained:

> In *Miranda* [*v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966)], the Supreme Court established a set of prophylactic rules to safeguard a suspect's Fifth Amendment privilege against compulsory self-incrimination. The Court held that a suspect in police custody must be informed specifically of the suspect's right to remain silent and to have an attorney present before being questioned. *Id*. at 479. The Court further held that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id*. at 474. Furthermore, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475.

The *Kowalski* Court continued:

> In [*Edwards v Arizona*, 451 US 477, 479; 101 S Ct 1880; 68 L Ed 2d 378 (1981)], following some initial police questioning, the defendant invoked his right to counsel, and the interrogation ceased. The next morning, police officers went to the county jail and asked to see the defendant. The defendant refused to speak to them, but was told that "he had" to talk. *Id*. The officers informed defendant of his *Miranda* rights, following which he gave a statement implicating himself. Realizing that additional safeguards were necessary to protect an accused's request for counsel, the Supreme Court in *Edwards* established a second layer of prophylaxis for the *Miranda* right to counsel:
>
> > [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. [*Id*. at 477-478, quoting *Edwards*, 451 US at 484-485.]

Our Supreme Court subsequently described the constitutional ruling as a "bright-line rule" that "the defendant must initiate communication concerning the investigation in order to avoid running afoul of the rule articulated in *Edwards*." *People v McRae*, 469 Mich 704, 715-716; 678 NW2d 425 (2004). Therefore, once a suspect invokes a constitutional right safeguarded by *Miranda*, it is wholly improper for law enforcement to engage in any "express questioning or its functional equivalent . . . that the police should know [is] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980).

Here, the record reflects that Pickett was questioned by two police detectives on June 8, 2016. Detective Mattison testified at the suppression hearing that he advised Pickett of his constitutional rights and that when he informed Pickett that he had a right to have a lawyer present, Pickett stated, "I would like that." Mattison testified that he finished advising Pickett of his rights and asked if Pickett was willing to talk. He recounted that Pickett said he "would like to have an attorney present." In response, Mattison told Pickett that "we don't provide [a lawyer]," "handed him a business card," and "told him that if he retains an attorney or if he is assigned an attorney to have his attorney give [the detective] a call and perhaps in the future [they] could sit down and talk." Mattison stated that, at that point, the other detective present, Detective McGehee, asked Pickett "if he was aware why he was being detained." Pickett answered "that he was aware that he was in an accident and that somebody was killed or that he had killed somebody." McGehee then said, "you killed five people . . . ." Mattison recalled that Pickett's "mouth kind of fell open" and that he appeared to be in shock and surprised before he asked, "What did I do, hit a family or something?" Mattison told Pickett that they "couldn't discuss that with him because he had asked for an attorney." At this point, Pickett "made some comments about, well it has already happened, it can't be changed, I might as well talk to you." Thereafter, Pickett made several incriminating statements, including an admission that he voluntarily ingested numerous drugs before driving.

The trial court found that after Pickett invoked his right to have a lawyer present Pickett initiated communication with the detectives so no *Miranda* violation occurred. However, it is clear that immediately after Pickett unequivocally invoked his right to a lawyer, a police detective asked Pickett "if he was aware why he was being detained." Regardless of the officer's reasons for asking that question, it is plain that the question was reasonably likely to elicit an incriminating response. See *id.*; see also *People v Paintman*, 412 Mich 518, 529; 315 NW2d 418 (1982) ("[I]t is inconsistent with *Miranda* and its progeny for authorities to instigate a reinterrogation of an accused in custody who has clearly asserted the right to counsel."). Accordingly, we conclude that the trial court clearly erred by finding there was no *Miranda* violation in this case.

Reversal, however, is unwarranted because the error is harmless. In *Arizona v Fulminante*, 499 US 279, 285; 111 S Ct 1246; 113 L Ed 2d 302 (1991), the United States Supreme Court held that a trial court's error in admitting a confession obtained by such a violation is subject to harmless-error analysis. "[I]f it is beyond a reasonable doubt that the jury would have convicted [the] defendant on the basis of untainted evidence, [the] defendant is not entitled to a new trial." *People v Dendel*, 289 Mich App 445, 476; 797 NW2d 645 (2010); see also *People v Mass*, 464 Mich 615, 640 n 29; 628 NW2d 540 (2001).

In this case, although his confession of ingesting pills and using methamphetamine was improperly admitted, the prosecution presented untainted evidence establishing the same facts that Pickett told the police about during his confession. Blood test evidence revealed that Pickett had taken methamphetamine, hydrocodone, tramadol, ketamine, and cyclobenzaprine. The police discovered methamphetamine, as well as pill bottles containing cyclobenzaprine and tramadol, in his truck. Likewise, Pickett's friend testified that she watched him take a "handful" of unidentified pills before speeding away in his truck. Thus, the detective's testimony regarding Pickett's statement, although improperly admitted, was entirely cumulative of other evidence presented at trial, and the jury would have convicted Pickett regardless of whether the trial court excluded his statement at trial. See *Dendel*, 289 Mich App at 476.

## III. PROPORTIONALITY OF SENTENCE

### A. STANDARD OF REVIEW

Pickett next argues that the trial court erred by imposing a sentence above the minimum guidelines range. "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied for appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). A trial court abuses its discretion by violating the principle of proportionality, " 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Id*. at 459-460, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). To facilitate appellate review, the trial court must consult the applicable guidelines range and justify the sentence imposed by stating the cause for any departure. *Steanhouse*, 500 Mich at 470. This means that the trial court must explain " 'why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been.' " *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017), quoting *People v Smith*, 482 Mich 292, 311; 754 NW2d 284 (2008).

### B. ANALYSIS

"Under the principle of proportionality standard, a sentence must be 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse (On Remand)*, 322 Mich App 233, 238; 911 NW2d 253 (2017), quoting *Milbourn*, 435 Mich at 636. Although they are only advisory, this Court follows our Supreme Court's directive that the sentencing guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion that trial courts must consult and take . . . into account when sentencing . . . ." *Dixon-Bey*, 321 Mich App at 524, quoting *Steanhouse*, 500 Mich at 474-475 (quotation marks omitted). In *Dixon-Bey*, this Court explained:

Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a "useful tool" or "guideposts" for effectively combating disparity in sentencings. Therefore, relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guidelines range continue to include (1)

-5-

whether the guidelines accurately reflect the seriousness of the crime; (2) factors not considered by the guidelines; and (3) factors considered by the guidelines but given inadequate weight. [*Dixon-Bey*, 321 Mich App at 524-525 (citations omitted).]

Factors not considered by the guidelines can include: "the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation." *People v Walden*, 319 Mich App 344, 353; 901 NW2d 142 (2017) (quotation marks and citation omitted).

Here, the trial court considered a number of factors in support of its decision to depart from the advisory guidelines range. The court started by stating its intention to "carefully consider and balance the principles of punishment, rehabilitation, protection of society, as well as deterrence." It acknowledged Pickett's lack of a criminal history, his consistent 30-year work history, and family support as positive factors. However, the trial court emphasized the toxicology report reflecting that Pickett had ingested methamphetamine. The trial court continued:

> Of course, I also consider the most significant issue, the grave factual circumstances that bring him before this Court. It is important that Mr. Pickett be reminded of the horrifying and gruesome details of the incident that brings him [here] today. In particular, the Court and the Jury heard about Mr. Pickett deciding to ingest multiple prescription medications, as well as methamphetamine. Then, deciding, and I want to stress these words; then deciding to drive a pickup truck on public roads during the late afternoon and early evening of a late spring day within Kalamazoo County.

> During the course of his travels, Mr. Pickett narrowly caused multiple collisions along Nichols Road. Then, faced a couple of possible head-on collisions on Arboretum Parkway, before dangerously traveling through a daycare center parking lot during a time when young children were being picked up [by] their parents. Mr. Pickett then progressed along Drake and undeterred by the traffic that comes with that time of day and location, he proceeded to drive off the road, into a traffic sign, before making his way into a school parking lot. Once again, at a time when multiple people, including children, were present.

> Either in an attempt not to . . . be apprehended, or because of his callousness, Mr. Pickett then continued through the northern part of Kalamazoo, driving completely off the roadway and through a family yard at G Avenue and Douglass, narrowly missing a residence before gathering himself enough to embark on North Westnedge. And, finally, just after nearly striking a pedestrian, [Pickett], at a high rate of speed, with no visible obstructions, continued his dangerous path and str—excuse me—struck not one, not two, not three, but nine unsuspecting bicyclists from behind, killing five of them; Fred Nelson, Suzanne Sipple, Debra Bradley, Larry Paulik, and Melissa Fevig-Hughes, and seriously injuring four others; Jennifer Johnson, Paul Gobble, Paul Runnels, and Sheila Jeske.

* * *

Charles Pickett, on June 7th, 2016, you selfishly and unnecessarily murdered five people, and forever altered the lives of four others. What I mean when I say selfish, is that you had multiple occasions that day to either never begin or to terminate your travels before causing such grave suffering. Plenty of time on Nichols Road, Drake Road, Arboretum Parkway, Douglas Road, G Avenue, Westnedge, you could have and should have stopped. Simply stopped, given up, whether in the middle of the road, or on the side, or in a parking lot, simply stopped and said I can't do this, I shouldn't do this. Instead, despite all the warnings, all the signals, you said to yourself nothing will stop me from doing what I want to do. That is, drive around this proud community with a complete disregard for the lives of its citizens, and with the knowledge that your driving was unsafe, dangerous, and deadly.

The trial court recognized that, although nonbinding, it was required to consider the calculated minimum sentence for the five separate second-degree murder convictions, noting that it had scored them in the C-3 grid, providing a minimum range of 225 to 375 months. The trial court found reason to depart upward from this range, explaining:

Areas that are permitted to be considered, and that I have considered, in the instant case include your lawyer saying in his sentencing memorandum and orally today, and a forensic assessment prepared, as well as your remarks a bit ago regarding remorse. In my opinion, you have not expressed a considerable amount of remorse for the loss of the five lives you caused, or the shattered lives of four others. During the trial, as well as other court hearings, you exhibited virtually no emotion. Neither today, nor during any previous courtroom experience, have I found you legitimately to be remorseful, either in your actions or verbally. I recognize that a moment ago you did express some remorse, but I find that to be (inaudible) inadequate.

The trial court further found that Pickett's conduct was "so violent and horrifying that the standard guideline scoring method simply fails to reflect their severity." Pickett's offense variable score was 200, which included "a full 100 points that [were] not fully accounted for in calculating the sentencing guideline range." To account for the disparity, the trial court determined that it would "use the next most severe cell available on the applicable grid in an attempt to makeup for those considerations not accounted for by the sentencing guidelines, and utilize this cell to provide objective factual guideposts to determine a proportionate sentence in this matter." Accordingly, the trial court relied on the next available grid along the prior record variable (PRV) level, which established a range of 270 to 450 months. In doing so, the court gave principled reasons for both the fact that it was departing from the minimum advisory sentencing range and for the extent of the departure.

On appeal, Pickett contends that the trial court failed to take into account the possibility that trial strategy might have impacted his ability to show remorse during the trial. However, Pickett did not argue at sentencing that he was unable to show remorse because of trial strategy. Moreover, although he suggests that he may have been advised by his defense lawyer to not

show remorse during the trial, he does not actually assert that his lawyer did, in fact, so advise him. Thus, he asks this Court to speculate that he may have had a valid reason for not showing remorse during the trial. We decline to do so. The trial court was in a better position to view Pickett's demeanor during the trial *and at sentencing*, and we will not interfere with its determination that Pickett did not show significant remorse. See *People v Kowalski,* 236 Mich App 470, 474-475; 601 NW2d 122 (1999) ("The sentencing of a defendant requires a trial court to rely on its experience as well as its overall perceptions adduced at trial. The trial court is in a unique position to weigh many intangibles apparent only to those present at a trial.").

Pickett also suggests that his diagnosis of bi-polar disorder could explain why his demeanor could have been interpreted as inappropriate during the trial. Yet, the details of Pickett's bi-polar diagnosis are not in the record and Pickett only directs this Court to a general statement from the Mayo Clinic regarding the typical symptoms of bi-polar disorder and major depressive disorder. Given that there is nothing on the record to support that Pickett's actual diagnosis would affect his ability to show "remorse," we will give no credit to Pickett's speculative challenge to the trial court's findings. See *id*.

Next, Pickett asserts that the trial court erred by concluding that a departure was justified because the Legislature did not contemplate situations where the offense variable (OV) level reached 200 points. Rather, Pickett maintains that a plain text reading of MCL 777.64 demonstrates that the Legislature did in fact intend to incorporate such situations within a given grid guideline because it chose to use a "+" symbol. However, Pickett acknowledges that this Court must follow the reasoning set forth in *Smith*, 482 Mich at 294-295, which explained that a trial court "may render a proportionate sentence above the highest minimum for someone with a similar PRV score . . . because the Legislature did not contemplate a defendant with such a high OV score, given that it used 100 OV points as the maximum for the grid." This authoritative pronouncement on the precise question at issue binds this Court. Moreover, as is clear from *Dixon-Bey*, 321 Mich App at 525, the trial court is permitted to consider factors that are given inadequate weight under the sentencing guidelines. Here, the court determined that the guidelines failed to account for 100 OV points; its consideration of the inadequate weight under the guidelines is proper.

Pickett's final argument is that the trial court's characterization of his conscious decision to take medications and illicit drugs before driving was "no more or less than the standard for a case" of driving while intoxicated. We disagree. The record shows that before crashing into a group of nine bicyclists while traveling at approximately 58 miles per hour, Pickett had seven separate instances of erratic and extremely dangerous driving. The trial court did not err by finding that each one of those instances provided Pickett ample opportunity to cease driving. Contrary to Pickett's suggestion, this case was not akin to a "standard" driving while intoxicated case. In sum, we conclude that the trial court adequately justified the sentence imposed.

Affirmed.

/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly