*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANGELA HORTON,

        Plaintiff-Appellant,

UNPUBLISHED
November 22, 2022

v

CLAUDINE PARKER-SMITH,

        Defendant,

and

CITY OF DETROIT,

        Defendant-Appellee.

No. 359617
Wayne Circuit Court
LC No. 20-000149-CZ

Before: GLEICHER, C.J., and SERVITTO and YATES, JJ.

PER CURIAM.

Claudine Parker-Smith shot and injured plaintiff, Angela Horton, without any provocation or just cause. For that, Parker-Smith was not only ordered to pay plaintiff $750,000 in damages, but also sent to prison. That could have put an end to the litigation arising from the shooting, but plaintiff pursued recompense from the city of Detroit under 42 USC 1983 because Parker-Smith was a reserve Detroit police officer on the date of the incident. Addressing plaintiff's civil claim against the city, the trial court granted summary disposition under MCR 2.116(C)(10), ruling that the city could not be held legally responsible for Parker-Smith's actions in shooting plaintiff. We agree that no theory under 42 USC 1983 can extend liability to the city, so we affirm.

## I. FACTUAL BACKGROUND

On May 3, 2018, Parker-Smith, who was an off-duty reserve officer with the Detroit Police Department ("DPD"), drove after plaintiff and shot her in the leg after the two women exchanged words. Everyone agrees that the shooting was unjustified, but the question on appeal is whether the city of Detroit bears legal responsibility for the actions of an off-duty reserve officer. The law-enforcement system in Detroit includes reserve officers, who are volunteers permitted to take part

-1-

in activities like crowd control and routine patrols. When off duty, reserve officers are considered ordinary citizens with no police powers.

On the day of the shooting, plaintiff walked to a store and purchased cigarettes and a beer. Plaintiff was disabled and walked with a cane. On her way home from the store, plaintiff stopped at a church and at an acquaintance's house to sit on the steps to rest. Then plaintiff made a third stop to rest, sitting on the porch of an abandoned house on Elmwood Street in Detroit to smoke a cigarette and drink her beer. There were only three houses on the block. Parker-Smith lived next door to the house where plaintiff sat to rest. On the other side of the house where plaintiff sat was a vacant house, which had previously been occupied by one of Parker-Smith's family members. Parker-Smith had stored belongings in that vacant house, and her belongings had been stolen in a break-in a few days before the shooting.

Parker-Smith came out of her house and told plaintiff that she had to move along because of the break-in. Plaintiff responded that she was just taking a break and Parker-Smith could call the police if she wanted. Parker-Smith informed plaintiff, "I am the police." Plaintiff told Parker-Smith she might as well arrest her because she was not going to move. Parker-Smith told plaintiff that she would call her "brothers," which plaintiff interpreted to mean calling for more officers. Because plaintiff felt threatened, she began walking down the street. During the encounter, Parker-Smith was wearing a fanny pack containing her personally-owned Glock pistol, her reserve-officer badge, and her identification card, but she did not remove any of those items from the fanny pack while the two women exchanged words.

Parker-Smith suspected that plaintiff was involved in the break-in, so she decided to follow her, hoping plaintiff would lead her to the burglars and her belongings. Plaintiff had walked about a block down the street when Parker-Smith got into her car and followed plaintiff. Plaintiff stated that Parker-Smith then tried to run her over with her vehicle twice, turning her car around before the second attempt. Plaintiff ran across a field and hid behind a tree in an attempt to elude Parker-Smith. Parker-Smith drove her car into the field and fired warning shots. Then, from the driver's seat of her car, Parker-Smith fired at least two shots through the passenger's side window. A shot hit plaintiff in her lower leg, fracturing her tibia and fibula and causing soft tissue injuries. Parker-Smith drove away without calling 911.

After the shooting, Parker-Smith drove to the DPD's seventh precinct, where she routinely reported as a reserve officer. Parker-Smith parked her car in the parking lot where police officers normally park and entered the building through a back door designated for officers' use. She had to enter a code to open the door. Parker-Smith told Officer Frederick Williams, who was working at the precinct's front desk, that she "may have shot someone," and Officer Williams took her gun. Officer Williams instructed Parker-Smith to sit in the public lobby of the precinct. Parker-Smith was not handcuffed while she waited in the lobby. She still had her cell phone, which she used to call her reserve corps lieutenant, David Jackson. Lieutenant Jackson called his supervisor to report the shooting and then went to the precinct to provide "moral support." Lieutenant John Kennedy notified a detective about the shooting, and then Parker-Smith was arrested.

Parker-Smith was formally charged with several criminal offenses for the shooting. After a bench trial, Parker-Smith was found guilty of discharging a firearm from a motor vehicle causing injury and possession of a firearm during the commission of a felony. She was acquitted of assault

with intent to do great bodily harm less than murder and a second charge of possession of a firearm during the commission of a felony. For the two counts of conviction, Parker-Smith was sentenced to serve more than three years in prison.

After Parker-Smith went to prison, plaintiff filed a civil complaint setting forth two claims against Parker-Smith and a single claim under 42 USC 1983 against the city based upon a theory of failure to train and supervise Parker-Smith. The city sought summary disposition under MCR 2.116(C)(7) and (10), contending that it had no custom or policy that violates constitutional rights, that Parker-Smith was not acting under color of law during the shooting because she was acting contrary to DPD policies, and that the DPD did not have actual or constructive knowledge that an off-duty reserve officer would likely commit an excessive-force constitutional violation. Plaintiff argued in response that Parker-Smith was acting under color of law because she identified herself as a police officer, threatened to call for backup, tried to arrest or detain plaintiff, and investigated a crime. Plaintiff also asserted that the city should be held liable for failure to train and supervise its reserve officers because the testimony of several reserve officers revealed that they were never trained in the limits of their powers and the DPD has no training file on Parker-Smith.

After hearing oral arguments, the trial court awarded summary disposition to the city under MCR 2.116(C)(10). Specifically, the trial court ruled that Parker-Smith did not act under color of law because her conduct related to a personal dispute. Further, the trial court concluded that it was the DPD's policy that reserve officers, whether on or off duty, have no police powers. Thus, the trial court faulted plaintiff's failure to identify any DPD policy that could support liability because reserve officers did not have police powers and Parker-Smith turned herself in after the shooting, demonstrating that she knew she had violated DPD policy. On December 7, 2021, the trial court entered a default judgment in the amount of $750,000 for plaintiff and against Parker-Smith. Then plaintiff launched this appeal against the city of Detroit.

## II. LEGAL ANALYSIS

We must review de novo the trial court's ruling on a motion for summary disposition under MCR 2.116(C)(10).[1] *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion on that basis "tests the *factual sufficiency* of a claim." *Id.* at 160. In addressing such a motion, the "trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* The motion "may only be granted when there is no genuine issue of material fact." *Id.* " 'A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ.' " *Id.* With these legal standards in mind, we must assess the evidence bearing upon plaintiff's claim against the city of Detroit.

Plaintiff's claim against the city of Detroit rests upon 42 USC 1983, which states that:

---

[1] Defendant moved for summary disposition under MCR 2.116(C)(7) and (10) and the trial court's order refers to both of those subsections of MCR 2.116(C), but the city's defense does not involve any basis for summary disposition under MCR 2.116(C)(7). Accordingly, we shall focus only on MCR 2.116(C)(10) as the basis for the award of summary disposition subject to review on appeal.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . . [42 USC 1983.]

Plaintiff contends that she has presented ample evidence to establish that the city of Detroit bears liability for Parker-Smith's act of shooting her in violation of the Fourth Amendment to the United States Constitution. Such a claim may be asserted under 42 USC 1983, which provides a remedy for a "violation of a right secured by the Constitution and laws of the United States" if the violation "was committed by a person acting under color of state law." *West v Atkins*, 487 US 42, 48; 108 S Ct 2250; 101 L Ed 2d 40 (1988). The United States Supreme Court has held that a municipality like the city of Detroit can be held liable in an action under 42 USC 1983 if a municipal policy or custom caused the violation of a federal right. *Monell v Dep't of Social Servs of City of New York*, 436 US 658, 694; 98 S Ct 2018; 56 L Ed 2d 611 (1978). In this case, the city of Detroit prevailed on summary disposition by arguing that Parker-Smith was not acting under color of law when she shot plaintiff and that the city had no policy or custom that caused the shooting. We shall address those two arguments in turn, recognizing that the city is entitled to summary disposition if either one of those two assertions is correct.

## A. COLOR OF LAW

The city of Detroit convinced the trial court that Parker-Smith was not acting under color of law when she shot plaintiff. Whether a defendant was acting under color of law is a question of law, *Neuens v Columbus*, 303 F3d 667, 670 (CA 6, 2002), so we must review the decision of the trial court de novo. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 US at 49 (quotation marks omitted). A person "acts under color of state law when he abuses the position given to him by the state." *Id*. at 50. "The key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id*.

To determine whether a person has acted under color of law, a court must look at factors including "whether the officer flashed a badge, identified himself as an officer, or arrested (or threatened to arrest) someone." *Swiecicki v Delgado*, 463 F3d 489, 496 (CA 6, 2006), abrogated on other grounds by *Wallace v Kato*, 549 US 384; 127 S Ct 1091; 166 L Ed 2d 973 (2007). While those factors are important, the United States Court of Appeals for the Sixth Circuit has made clear that "[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." *Stengel v Belcher*, 522 F2d 438, 441 (CA 6, 1975) (quotation marks omitted). "The element [of color of law] is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." *Johnson v Phillips*, 664 F3d 232, 240 (CA 8, 2011).

Beyond that, the challenged conduct must be "fairly attributable to the state." *Romanski v Detroit Entertainment LLC*, 428 F3d 629, 636 (CA 6, 2005). What is fairly attributable to the state "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Academy v*

*Tenn Secondary Sch Athletic Ass'n*, 531 US 288, 295; 121 S Ct 924; 148 L Ed 2d 807 (2001). The United States Court of Appeals for the Sixth Circuit has ruled that "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters v Morristown Tenn*, 242 F3d 353, 359 (CA 6, 2001). "Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Id*.

The fact that Parker-Smith was a reserve officer, rather than a sworn officer, does not affect the analysis. Our Supreme Court has recognized that reserve officers are state actors because they possess state authority. *People v McRae*, 469 Mich 704, 710-712; 678 NW2d 425 (2004). Thus, the question is whether Parker-Smith purported to act under her state authority. *Id*. at 712.

In *Stengel*, the defendant, an off-duty officer, was in a café when a fight broke out. *Stengel*, 522 F2d at 440. Under police-department policies, the defendant had to carry mace chemical spray and his service weapon and intervene in criminal activity at all times while off duty, which he did in the incident that gave rise to the case. *Id*. at 440-441. The defendant, without ever identifying himself as a police officer or displaying his badge, tried to break up the fight and was struck and knocked to the ground. *Id*. at 440. In response, the defendant sprayed mace and shot three of the people in the fight, killing two and paralyzing the other. *Id*. The United States Court of Appeals for the Sixth Circuit affirmed the jury's finding that the defendant acted under color of law because the defendant was following department policy requiring him to carry weapons and attempt to stop criminal activity at all times. *Id*. at 441. The court reached that conclusion despite observing that, had the defendant identified himself as a police officer and issued a verbal order instead of entering the fray, injury could have been completely avoided. *Id*. at 441-442.

Here, under the totality of the circumstances, Parker-Smith was acting under color of law because she purported to invoke her state authority during her encounter with plaintiff. Although *Stengel* is factually distinguishable from this case, it is instructive for the principle that the exercise of state authority and the underlying intentions of the officer's actions dictate whether the officer acted under color of law. Unlike the defendant in *Stengel*, Parker-Smith had no duty to intervene upon witnessing a crime. But while she was on duty, Parker-Smith had the authority, or, at least under custom of the DPD, used such authority, to take the actions that led to the shooting. Reserve officers were required to carry a firearm while in uniform. Reserve officers could go on patrol by themselves. Parker-Smith stated that she regularly sat in a police scout car looking out for criminal activity and that she was supposed to intervene whenever a situation arose. A reserve officer was permitted to detain suspects, make felony arrests, and make misdemeanor arrests with a sworn police officer. Parker-Smith stated that, by following plaintiff, she was "just doing what I've been taught to do to observe and report." This indicates that if Parker-Smith had been on duty at the time of her encounter with plaintiff, she would have had the authority to engage in all of her actions up until the point that she used excessive force.

To be sure, Parker-Smith was not in uniform and was not displaying a badge or a firearm, but she had her badge and firearm concealed in a fanny pack.[2] Moreover, Parker-Smith identified herself as a police officer, and plaintiff believed Parker-Smith was, in fact, a police officer. From the outset of the encounter, plaintiff made it clear to Parker-Smith that she was not going to move from the porch absent police involvement. Parker-Smith then identified herself as a police officer and threatened to call for backup. Plaintiff testified that she believed Parker-Smith when she told plaintiff she was a police officer, and plaintiff did not know of a distinction between a sworn police officer and a reserve police officer. Plaintiff understood that there were plain-clothed officers in the neighborhood, and she testified that she was not aware of any situations in which someone had impersonated a police officer. Only after plaintiff believed that multiple officers would be on their way did plaintiff decide to walk away.

Without question, Parker-Smith had some personal interest in identifying the burglars who stole her belongings and recovering her stolen property. But Parker-Smith planned to use her state authority in trying to do so by sharing the information she found with the police. Especially given her authorities and duties as a reserve officer, Parker-Smith conducted herself as a police officer, rather than a private citizen. Parker-Smith began the encounter by investigating what she believed was a crime. And after the shooting, Parker-Smith drove to the DPD precinct where she ordinarily reported, parked where officers normally park, entered the precinct through a police-only door that required a code to open, and called her supervisor. In other words, Parker-Smith did not conduct herself as an ordinary citizen. Instead, Parker-Smith was acting under color of law. See *Stengel*, 522 F2d at 441 (stating that "[i]t is the nature of the act performed . . . which determines whether the officer has acted under color of law").

## B. CAUSATION

Although plaintiff has convinced us that the record indicates that Parker-Smith was acting under color of law, plaintiff cannot defeat defendant's motion for summary disposition unless she can also persuade us that a genuine issue of material fact exists concerning causation. After all, a municipality like Detroit "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v Harris*, 489 US 378, 385; 109 S Ct 1197; 103 L Ed 2d 412 (1989). A municipality cannot be deemed liable for the actions of its police officers based upon a respondeat superior theory. *Id*. As our Supreme Court has stated, "to establish a genuine issue of material fact, a plaintiff must point to facts from which a person could reasonably infer that the municipality's policy or custom was the cause in fact and the proximate cause of the alleged constitutional violation." *Johnson v VanderKooi*, 502 Mich 751, 768; 918 NW2d 541 (2018).

Plaintiff argues in this case that the city of Detroit's flawed policy or custom took the forms of inadequate training of its reserve police officers and failure to supervise its reserve officers. To be sure, plaintiff need not point to a formal policy in order to proceed with her 42 USC 1983 claim

---

[2] Reserve officers were not issued DPD firearms. However, reserve officers were required to carry a personally-owned pistol while on duty. The Glock 40 pistol Parker-Smith used to shoot plaintiff was one of three pistol models reserve officers were permitted to carry while on duty, although it was not the firearm Parker-Smith carried on duty.

against the city. Plaintiff may instead rely upon a more informal custom of the city "if the 'relevant practice is so widespread as to have the force of law[.]' " *Id.* at 762. But "to survive a motion for summary disposition, a plaintiff must first identify and connect a . . . custom to the municipality, and then point to facts in the record demonstrating that implementation or execution of that . . . custom caused the alleged constitutional violation." *Id.* at 763. As we shall explain, plaintiff has not identified a custom of the city of Detroit that caused the shooting by Parker-Smith.

A lack of training or supervision can rise to the level of a custom, but the circumstances in which a failure to train or supervise constitutes a custom are quite limited. *City of Canton, Ohio*, 489 US at 387. A municipality's liability "for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v Thompson*, 563 US 51, 61; 131 S Ct 1350; 179 L Ed 2d 417 (2011). To support a 42 USC 1983 claim based upon the failure to train or supervise, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel Pendergrass v Cleveland Muni Sch Dist*, 455 F3d 690, 700 (CA 6, 2006). A municipality can only be held liable when the failure to train or supervise "reflects a deliberate or conscious choice." *Id*. (quotation marks omitted). As the United States Supreme Court has stated, deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd of Co Comm'rs of Bryan Co, Okla v Brown*, 520 US 397, 410; 117 S Ct 1382; 137 L Ed 2d 626 (1997).

The most common method for proving the failure to train or supervise is to show a pattern of unconstitutional conduct that puts a municipality on notice that its training or supervision is inadequate. *Ouza v Dearborn Heights*, 969 F3d 265, 287 (CA 6, 2020). Plaintiff has proffered no evidence of a pattern of conduct, choosing instead to contend that the single incident giving rise to her complaint proves deliberate indifference on its own. Speaking of single-incident liability, the United States Supreme Court has explained that, "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 US at 409. "Under this approach of demonstrating deliberate indifference, a plaintiff does not need to show that the municipality had notice of a pattern of unconstitutional conduct." *Ouza*, 969 F3d at 287. Single-incident liability is only appropriate, however, when "the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it." *Id*. As the United States Supreme Court has cautioned:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. [*City of Canton, Ohio*, 489 US at 390-391 (quotation marks and citations omitted).]

Thus, plaintiff must show that a systemic failure on the part of the DPD led to the shooting.

The record reveals that the city of Detroit provided training and supervision of its reserve officers that was sparse and haphazard. With respect to training, reserve officers were required to attend two firearms-qualification and use-of-force training sessions each year and pass a test at the end of each session. There were also twice-annual sessions on other topics, such as COVID-19 protocols or bio hazards, which were not all mandatory and did not take place at any set intervals. Attendance at those intermittent sessions was not always tracked, and the DPD did not even have any records of when the training sessions were performed. In contrast, sworn police officers were required to take part twice each year in firearms training and attend 40 hours of additional training every six months. Similarly, the record reflects that on-duty supervision was problematic. Reserve officers wore uniforms and carried badges similar to sworn officers, and reserve officers had many of the same powers and duties as sworn officers. Indeed, reserve officers were even permitted to drive police scout cars by themselves. Reserve officers had to work with a partner, but that partner could be another reserve officer if they were acting under the discretion of a sworn officer. Despite this, two sworn officers from Parker-Smith's precinct testified that they were provided no training on working with reserve officers or on the scope of authority of a reserve officer. This persistent lack of training and supervision of reserve officers approaches the stringent standard of deliberate indifference necessary to support single-incident liability under 42 USC 1983. *Ouza*, 969 F3d at 288-289 (reversing summary judgment because no evidence refuted plaintiff's allegations that police department did not provide any training to its officers on probable-cause determinations, excessive force, or proper handcuffing technique).

But plaintiff's 42 USC 1983 claim against the city founders upon her inability to establish any causal link between the alleged custom of inadequate training and supervision and the shooting of plaintiff. Even if a municipal employee uses excessive force to harm a plaintiff, "the plaintiff cannot hold the municipality liable without proof that proper training [or supervision] would have prevented this force." *Gambrel v Knox Co, Ky*, 25 F4th 391, 409 (CA 6, 2021). "[T]o establish a genuine issue of material fact, a plaintiff must point to facts from which a person could reasonably infer that the municipality's . . . custom was the cause in fact and the proximate cause of the alleged constitutional violation." *Johnson*, 502 Mich at 768. "[A] municipal policy or custom is the cause in fact and proximate cause of a constitutional violation if the municipality *authorizes*, but does not necessarily require, the specific conduct that constitutes the violation, and its employees acted pursuant to that authorization." *Id.* at 769.

Here, in contrast to *Ouza*, plaintiff has not established an affirmative link between the city's lack of training and supervision of reserve officers and plaintiff's injury. In *Ouza*, the municipality failed to train its officers in probable cause determinations and appropriate handcuffing techniques, which are situations that police officers should be expected to routinely face. See *Ouza*, 969 F3d at 288-289. As a result, there was a specific gap in training for situations—determining probable cause and handcuffing suspects—that officers would regularly encounter. Here, Parker-Smith was responsible for a violation of the Fourth Amendment in circumstances that were manifestly out of the ordinary, i.e., driving a car to chase down and then shoot a suspect. Additionally, although the city cannot demonstrate that Parker-Smith regularly completed her training sessions, Parker-Smith did complete firearms-use and use-of-force training less than a year before the shooting. Plaintiff has not identified a deficiency in Parker-Smith's training or supervision that would have prevented the shooting of plaintiff. Nor has plaintiff offered any evidence that the city of Detroit authorized the shooting through any formal policy or more informal custom. See *Johnson*, 502 Mich at 769. Therefore, the trial court properly awarded summary disposition under MCR 2.116(C)(10) to the

city of Detroit based upon the lack of any causal link between inadequate training and supervision of reserve officers and Parker-Smith's shooting of plaintiff.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Christopher P. Yates