*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

D-ANGELO MARQUISE DAVIS,

        Defendant-Appellant.

UNPUBLISHED
July 11, 2024

No. 363096
Kalamazoo Circuit Court
LC No. 2021-000555-FC

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

PER CURIAM.

Defendant, D-Angelo Marquise Davis, appeals by right his convictions of two counts of first-degree murder, MCL 750.316(1)(a), for aiding and abetting in the shooting deaths of Floyd Brashers and Katoya McPherson, following a jury trial. The trial court sentenced defendant to life in prison without the possibility of parole for each conviction. On appeal, defendant argues that the trial court erred when it denied his motion to suppress the statements he made to police. Defendant also argues that there was insufficient evidence to convict him of first-degree murder, and that he was deprived of a fair trial. Finding no errors warranting relief, we affirm.

## I. FACTS

In December 2020, defendant purchased a car from the victims, Brashers and McPherson, with whom he was staying at the time. On or about December 28, 2020, Brashers and McPherson sold the same car to a salvage dealer while defendant was sleeping. When defendant awoke, he argued with Brashers and McPherson about the car and asked where it was. Brashers and McPherson called the police. The officer who responded told defendant that it was a civil matter and asked him to leave the apartment. Defendant's half-sister Tonesha Taylor-McMillon picked up defendant from the apartment and they drove around that day looking for defendant's car. She drove defendant back to Brashers' and McPherson's apartment at about noon to confront them again. A police officer again asked defendant to leave.

Later that day, defendant asked Taylor-McMillon to drive him to an apartment complex that neighbored the complex where Brashers and McPherson lived. Tikario McMillon, Taylor-McMillon's brother (and defendant's half-brother), also went to the apartment complex with

defendant and Taylor-McMillon. Defendant instructed Taylor-McMillon to park at the head of a trail that led through a wooded area and came out near Brashers' and McPherson's apartment. Defendant instructed Taylor-McMillon to stay in the car and wait, while defendant and McMillon left and went into the woods. Defendant had a bat. They returned "no more than ten minutes" later, and appeared out of breath and "panicky." Taylor-McMillon then drove them away.

The next day, a maintenance worker for the apartment complex discovered that the sliding glass door to Brashers' and McPherson's apartment had been shattered. When he entered to investigate, he saw two people lying unresponsive in the bedroom. Brashers had been shot five times and McPherson had been shot twice. A nearby home's security camera footage showed two people approach the sliding door and enter the apartment. They exited eight seconds later.

Defendant was eventually arrested for the murders after he confessed that he had gone to the apartment with McMillon to kill Brashers and McPherson. Defendant initially pleaded guilty to two counts of second-degree murder as part of a plea deal in which he would testify against McMillon. However, defendant refused to testify against McMillon, and the trial court granted the prosecutor's motion to vacate defendant's plea. The case proceeded to trial. The jury found defendant guilty of two counts of first-degree premeditated murder. Defendant now appeals.

## II. SUPPRESSION OF STATEMENTS

Defendant first argues that the trial court erred when it admitted at trial two statements defendant made to police officers. Defendant maintains that he did not validly waive his earlier invocation of his right to have a lawyer present and, for that reason, claims that his subsequent statements are inadmissible. We disagree.

## A. STANDARD OF REVIEW

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Id*. (citation omitted). This Court reviews for clear error the factual findings underlying a trial court's application of the law. *Id*. A factual finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court has made a mistake. *Id*. "[D]eference is given to the trial court's assessment of the weight of the evidence and the credibility of the witnesses." *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003).

## B. ANALYSIS

The trial court held an evidentiary hearing on defendant's motion to suppress. The court heard evidence of eight different encounters that defendant had with police, but the prosecutor was seeking to admit only four of defendant's statements. The trial court granted defendant's motion to suppress two of the four statements. Defendant contends the trial court erred in admitting the remaining two statements at trial because the court did not consider the cumulative impact of the

alleged prior Fifth Amendment violations. On that basis, defendant asserts that his decision to speak should not be deemed a waiver of his earlier invocation of the right to counsel. We disagree.

The United States and Michigan Constitutions guarantee the right against self-incrimination. US Const, Am V; US Const, Am XIV; Const 1963, art 1, § 17. "To effectuate this right, the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (citation omitted). A custodial interrogation is "questioning initiated by law enforcement officers after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753 (2011) (citation omitted). "Whether a defendant is in custody for purposes of *Miranda* at the time of an interrogation is determined by looking at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he or she was free to leave." *People v Campbell*, 329 Mich App 185, 202; 942 NW2d 51 (2019) (citation omitted). Some circumstances that are relevant to this inquiry include: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the questioning, (4) the presence or absence of physical restraints during the questioning, and (5) whether the suspect was released at the end of the questioning. *Barritt*, 325 Mich App at 562-563.

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010), citing *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). When a police officer interrogates a suspect who is in custody, that person "must first be informed in clear and unequivocal terms that he has the right to remain silent," *Miranda*, 384 US at 467-469, and the right to the presence of an attorney, *Edwards v Arizona*, 451 US 477, 482; 101 S Ct 1880; 68 L Ed 2d 378 (1981). And if a custodial interrogation is not preceded by the *Miranda* warnings, statements made during the interrogation may not be used at trial. *Campbell*, 329 Mich App at 202.

If the accused requests counsel at any time, the interrogation must stop until counsel has been made available, "unless the accused himself initiates further communication, exchanges, or conversations with police." *Edwards*, 451 US at 484-485. This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Clark*, 330 Mich App at 418-419 (citation omitted). The *Edwards* rule embodies two independent inquiries:

> First, courts must determine whether the accused actually invoked his right to counsel…. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. [*Id*. at 419 (citation omitted)].

The fact that the police do not again fully advise the person of his *Miranda* rights after he reinitiates communication with them is just one factor to consider under the totality of the circumstances. *Id*.

The holding in *Edwards* does not prohibit *all* communication between the police and a suspect who has requested an attorney. Rather, it prohibits further "police-initiated custodial interrogation." *People v Kowalski*, 230 Mich App 464, 478; 584 NW2d 613 (1998). "For purposes

of *Miranda*, interrogation refers to express questioning or its 'functional equivalent.'" *Id*. at 479, citing *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). The functional equivalent of interrogation would include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*., citing *Innis*, 446 US at 301. Generally, a mere inquiry into whether the suspect has changed his mind about wanting to speak with an attorney is not considered "interrogation" under *Edwards*. *Id*. But when a suspect initiates conversation and shows a willingness and desire to talk about his case, further questioning of the suspect is not necessarily in violation of the suspect's Fifth Amendment rights. See *People v McRae*, 469 Mich 704, 716-718; 678 NW2d 425 (2004). Furthermore, when an individual has been released from custody and has returned to his normal life before the later attempted interrogation, the risk of coercion is less likely. *Maryland v Shatzer*, 559 US 98, 107; 130 S Ct 1213; 175 L Ed 2d 1045 (2010). The U.S. Supreme Court found that usually a 14-day break in custody "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id*. at 110.

Even if a suspect initiates further discussion, his waiver of the right to counsel must be knowingly and intelligently made, *Clark*, 330 Mich App at 419, and any subsequent statements must be voluntarily made, See *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). The burden is on the prosecution to demonstrate the statement was voluntary by a preponderance of the evidence. *Stewart*, 512 Mich at 480-481. If a suspect's "will was overborne or if his confession was not the product of a rational intellect and free will, his confession is inadmissible because [it was] coerced." *Id*. at 480. "Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure." *Id*. This Court considers the totality of the circumstances surrounding the confession to determine whether it was freely and voluntarily made. *Id*. at 481. While all relevant circumstances must be considered, this Court has specifically considered the age of the suspect, intelligence level, the extent of his experience with police, the length of the questioning, whether the suspect was under the influence, whether he was physically abused, and whether he was threatened with abuse, among other factors. See *id*.

Here, the trial court held an evidentiary hearing on defendant's motion to suppress and heard evidence of several different encounters that defendant had with police officers in the months leading to his arrest. Kalamazoo Township Police Detective Sergeant Larry Haynor was the first officer to interview defendant regarding the murders. He interviewed defendant on January 6, 2021, at the police station after defendant had been arrested for violating a condition of his bond in an unrelated case. After reading the required *Miranda* warnings, however, Detective Haynor asked defendant about the murders. Defendant indicated he wanted a lawyer, so Detective Haynor stopped the interrogation and had another officer take defendant to jail for the bond violation. An officer stayed with defendant in the room after Detective Haynor left and spoke about the murder investigation. The prosecution did not seek to admit any statements from this encounter so the trial court did not consider it.

On February 22, 2021, defendant was arrested for the murders and interrogated by Officer Justin Cary. A detective was also present. Defendant was in custody at the police station and questioned in an interview room. Officer Cary read defendant his *Miranda* rights but did not ask defendant if he would waive those rights, given his earlier assertion of his right to counsel. This

interview lasted for about 45 minutes and was recorded. Defendant asked for an attorney shortly after the interview began. Officer Cary continued making declaratory statements about the murder investigation but did not ask defendant any more questions. Defendant then asked about his sister Taylor-McMillon, who was still incarcerated for the murders. Officer Cary said that Taylor-McMillon was in trouble. Officer Cary then said he could not discuss the investigation any further because defendant asserted his right to counsel, but defendant asked him to stay. The two spoke for a little while longer until defendant again stated that he wanted to speak to an attorney. Officer Cary then ended the interrogation but waited and chatted with defendant until he could be transported to jail. Defendant was released from jail soon after arrest because the prosecutor elected not to charge him with the murders at that time.

The trial court found that defendant was in custody during the February 22, 2021 interview. The court believed the evidence showed that Officer Cary sought to interrogate defendant more than 14 days after he asserted his right to a lawyer in January 2021. As such, the rule in *Edwards* did not apply to this interrogation, and a waiver consistent with *Miranda* would have been sufficient. See *Shatzer*, 559 US at 110-111. The trial court acknowledged that *Miranda* warnings were provided, but defendant did not waive his rights. The court found defendant unequivocally invoked his right to an attorney, and Officer Cary continued speaking with him after he invoked his right to counsel. Therefore, the trial court suppressed the statements the prosecution was attempting to admit from this encounter.

Two days later, on February 24, 2021, defendant called Officer Cary and asked why his sister was still in jail when he had been released. This conversation was not recorded. Defendant called Officer Cary again the next day, February 25, 2021, to ask about retrieving his wallet and other personal belongings from the police station. Officer Cary informed defendant he could stop by the police station the next day to get his items. The trial court did not address the testimony concerning these calls because the prosecutor was not seeking to admit any of defendant's statements. But the record shows defendant initiated both of these calls and was free to hang up at any time. Therefore, these were clearly not custodial interrogations and there was nothing improper about them.

Defendant went to the police station to pick up his wallet the next day on February 26, 2021. Defendant spoke with Officer Cary outside the front door of the station, "either on the sidewalk or in the parking lot." Officer Cary audio-recorded this interaction by placing his body camera in his pocket. Officer Cary began talking about the murder investigation. He told defendant that he knew defendant's brother was involved, and made a comment that seeing his brother and sister in jail would weigh on defendant's conscience. Defendant said that he wanted to spend his last paycheck before turning himself in.

The prosecutor sought to admit defendant's comment about turning himself in. The trial court found defendant chose to go the police station to inquire about his personal belongings, therefore, he was not in custody and *Miranda* warnings were not required. Further, the trial court concluded that Officer Cary did not question defendant nor make any statements that were the functional equivalent of questioning. The trial court found this statement to be admissible at trial.

Defendant asserts the trial court erred in admitting this statement because defendant had earlier asserted his right to a lawyer. However, it is evident that defendant was not in custody

during the February 26, 2021 encounter, as the trial court found. In its ruling, the trial court considered the totality of the circumstances, including the location and timing of the statements, to conclude that defendant was not in custody. The court found that the conversation took place "outside of the police station and after [defendant] chose to go to the location to talk to Cary about an unrelated matter." The trial court found defendant's statement to be admissible because Officer Cary did not ask defendant a question that prompted defendant to make the statement about turning himself in. As such, the trial court found Officer Cary was not initiating a custodial interrogation and defendant was free to walk away at any time.

The trial court did not err in concluding defendant was not in custody for purposes of *Miranda* during this encounter on February 26, 2021. The totality of the circumstances indicate defendant was not in a custodial environment or otherwise not free to leave. As to the location, a police station has been found to be a custodial environment because it is a "police-dominated atmosphere." See *Barritt*, 325 Mich App at 563. However, the U.S. Supreme Court has also found that when an accused voluntarily goes to the police station for questioning, is aware that he is not under arrest, and terminates the interaction without hindrance, the totality of the circumstances indicates that he is not in custody for *Miranda* purposes. *Oregon v Mathiason*, 429 US 492, 493; 97 S Ct 711; 50 L Ed 2d 714 (1977). Here, defendant voluntarily agreed to go to the police station for a matter unrelated to the murder investigation. While Officer Cary changed the topic to the murder investigation, defendant was clearly aware that he was not under arrest at that time and had no obligation to speak about the investigation. Indeed, defendant terminated the interaction by walking away from Officer Cary without hindrance. Therefore, defendant was not in custody or otherwise deprived of his freedom of action in any significant way to require *Miranda* warnings to be administered. See *Steele*, 292 Mich App at 316.

On March 9, 2021, defendant was meeting with his tether agent at the agent's office as a condition of his bond in an unrelated case. Officer Cary and Detective Jerzyk called defendant's tether agent ahead of the meeting and asked when defendant would be in the office so that they could serve him the search warrant tabulation for defendant's cell phone. When they arrived, defendant was there. Detective Jerzyk and the tether agent left the room and shut the door behind them, leaving Officer Cary and defendant alone. This interaction was audio-recorded on Officer Cary's body camera, which was again hidden in his pocket. *Miranda* warnings were not provided.

The trial court found that the totality of the circumstances surrounding the March 9, 2021 encounter at the tether agent's office indicated that defendant was in a custodial environment. Defendant was required to be there as a condition of his bond, the tether agent was a government official in her office, the door was shut, and it was not clear if defendant was free to leave. Therefore, the trial court found defendant's statements should be suppressed because he was not informed of his *Miranda* rights and was interrogated regarding the murders. See *Campbell*, 329 Mich App at 202 (if a custodial interrogation is not preceded by an adequate warning, statements made may not be introduced into evidence at trial).

The last encounter with police occurred on March 29, 2021. Defendant called Officer Cary at his office and asked for the prosecutor's phone number. Officer Cary gave him the prosecutor's phone number and said defendant could also come to the station and speak to him, or contact a lawyer to work out a plea deal. Defendant said that he wanted to come in and talk because his

family was pressuring him since his sister was still in jail. Defendant asked for assurance that his sister would not go to prison, and Officer Cary replied that he could not promise that.

The trial court did not consider this phone call because the prosecution was not seeking to admit defendant's statements from this call. Defendant asserts Officer Cary was engaging in coercive tactics during the call because he was taking advantage of the pressure defendant was facing from his family. However, defendant was calling from home, he was not in custody, and his statements were voluntary. Although a suspect's mental condition is an important factor to consider when determining whether a confession was voluntary, a defendant must still establish that the police officers engaged in coercive conduct that caused the confession to be involuntary. See *Colorado v Connelly*, 479 US 157, 164; 107 S Ct 515; 93 L Ed 2d 473 (1986). Officer Cary did not coerce defendant into doing or saying anything during this phone call. The use of any one interrogation tactic to pressure a defendant to answer does not by itself demonstrate that a confession was involuntarily caused by police misconduct; instead, the evidence must show that the overall impact of the interrogation caused the defendant's will to be overborne. See *Stewart*, 512 Mich at 500-501. Defendant initiated the call and volunteered information about his family as an explanation for the call, and it is clear Officer's Cary's statements did not cause defendant's will to be overborne. The same is true for the custodial interrogation that occurred later that day.

Several hours after the call on March 29, 2021, defendant arrived at the police station. Officer Cary invited defendant to an interview room. This interview lasted an hour and was recorded. Defendant was not under arrest at this time but Officer Cary advised defendant of his *Miranda* rights. Officer Cary stated that if defendant confessed, he would be the officer to take defendant to jail. Defendant asked for clarification about the right to talk to an attorney. He asked "why does it say I have the right to have a lawyer present for questioning?" Officer Cary explained that if defendant knew a lawyer he could call them and they could be present for questioning, but if he does not know a lawyer, Officer Cary could not "generate" a lawyer to be present for questioning because a court-appointed attorney could not be provided until arraignment.

Officer Cary then stated that if defendant confessed, it would help his sister who was still in jail. Officer Cary asked defendant when he decided to get revenge on Brashers and McPherson for scrapping his car without his knowledge. Defendant replied that it was no longer about the car, it was about his pride. Defendant explained he had been homeless and had worked hard to be able to buy the car. Defendant asked to borrow Taylor-McMillon's car, but she would not let him, so she agreed to drive defendant and McMillon back to the victims' apartment. Defendant asked to borrow McMillon's gun. McMillon would not agree to let him take the gun, but McMillon agreed to accompany defendant into the apartment. Defendant admitted he broke the window of the victims' sliding glass door with the bat. Defendant admitted that McMillon was the shooter. Defendant explained that he wanted to shoot the victims, but McMillon did not want to give him the gun. Afterwards, they threw the bat in a dumpster. Defendant expressed remorse that the victims' children would grow up without parents, but then stated he did not feel too bad about killing them because they were "shitty parents."

The trial court found that defendant was not in custody and that he adequately waived his rights when he voluntarily chose to talk to Officer Cary. The court found that defendant agreed to go inside the police station and speak to the police with full knowledge that he would be arrested that day if he confessed. The trial court found defendant's statements were not coerced, and

rejected defendant's argument that the repeated use of coercive tactics over the eight encounters overwhelmed his will. Finally, the court found there was no evidence defendant was overwhelmed or distraught as a result of the actions by the police officers.

We find that Officer Cary's recitation of defendant's rights was consistent with the requirements of *Miranda*. See *Duckworth v Eagan*, 492 US 195, 203-204; 109 S Ct 2875; 106 L Ed 2d 166 (1989) (recognizing that police departments do not need to have a "station house lawyer" and holding that, when the police department cannot provide appointed counsel, it is sufficient that police refrain from questioning a suspect unless he validly waives his or her right to counsel); see also *People v Mathews*, 324 Mich App 416, 438-439; 922 NW2d 371 (2018) (police officers must inform the defendant that he has the right to have an attorney present during the interrogation). Additionally, defendant's question concerning the presence of an attorney did not constitute an unequivocal assertion of his right to counsel because he only asked for clarification about the meaning of the right to counsel and when he would be able to speak with an appointed attorney. See *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005) (invocation of the right to counsel must be unequivocal). Accordingly, there was nothing improper about Officer Cary's advice of rights, and nothing suggested that defendant did not understand his rights. Indeed, contrary to defendant's contention on appeal, defendant knew that he could stop the interrogation by asserting his right to a lawyer because the officers ended two prior interrogations as a result of his invocation of the right, and they told him that was the reason they were required to end those interrogations.

Further, we find there was no "cumulative effect" of the alleged violations of defendant's requests for counsel because (1) as explained above, there had been only one previous violation of defendant's right to counsel on February 22, 2021, and (2) there had been a sufficient break in custody since the last time defendant was in police custody. If at least 14 days have passed between a custodial interrogation and when the police re-approach a defendant, as long as the defendant knowingly and voluntarily waives *Miranda* rights at the subsequent encounter, any voluntary statements following the waiver will be admissible at trial. See *Shatzer*, 559 US at 110; *Stewart*, 512 Mich at 480. The last custodial interrogation had occurred on March 9 in the tether agent's office, and defendant called Officer Cary and came to the police station to talk on March 29. This was a 20-day break in custody that allowed defendant to reacclimate himself to normal life before speaking again with police. In fact, defendant disclosed to Officer Cary that he did speak with an attorney during this break in custody, and the attorney advised defendant not to speak with the police. Despite this advice, defendant chose to confess voluntarily. Therefore, defendant has not shown that the trial court abused its discretion when it allowed his statements into evidence. See *Clark*, 330 Mich App at 415.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that there was insufficient evidence to convict him of first-degree premeditated murder. He argues that the prosecution did not prove the element of intent beyond a reasonable doubt. Defendant moved for a new trial based on the sufficiency of the evidence, and the trial court denied the motion.

## A. STANDARD OF REVIEW

-8-

A challenge to the sufficiency of the evidence presents a question of law that this Court reviews de novo. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the elements of the crime were proved beyond a reasonable doubt. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018); *Clark*, 330 Mich App at 436. This Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194 (2011).

## B. ANALYSIS

Defendant argues the prosecution failed to prove the third element of aiding and abetting first-degree premeditated murder. First-degree murder includes "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a). "A murder is committed deliberately if done without adequate provocation–that is to say while undisturbed by hot blood, and it is premeditated if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder." *Clark*, 330 Mich App at 436-437 (citations omitted). The prosecution proceeded to trial on the theory that defendant aided and abetted the murders. The elements of aiding and abetting are

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010), quoting *People v. Robinson*, 475 Mich. 1, 6, 715 N.W.2d 44 (2006) (quotation marks and citations omitted).]

The jury was properly instructed on the third element of aiding and abetting first-degree murder: "at that time the defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission or that the crime alleged was a natural and probable consequence of the crime intended." M Crim JI 8.1(3)(c). "In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is necessary to establish that a defendant had the intent to kill and proceeded with deliberation and premeditation." *Clark*, 330 Mich App at 437. "The prosecutor may establish premeditation and deliberation through evidence of the parties' prior relationship, the defendant's actions before the killing, the circumstances surrounding the killing itself, or the defendant's conduct after the killing." *Id*.

Defendant does not dispute there was evidence establishing that McMillon shot and killed Brashers and McPherson, and defendant does not dispute that he was there during the shootings. Rather, defendant argues there was no evidence he had the requisite premeditated intent to kill the victims, and argues there was no evidence McMillon had the requisite intent and that defendant was aware of his intent. However, defendant's argument rests on the assumption that the trial court erred when it denied his motion to suppress. As discussed above, the trial court did not err

in denying defendant's motion to suppress. Defendant's statements and ultimate confession to police were properly admitted and used to show his premeditated intent at trial.

There was evidence from which the jury could infer that defendant was angry with the victims on the day of the killings because they scrapped his vehicle. The prosecution used the parties' prior relationship and the events leading up to the murders to establish defendant intended to kill the victims. The testimony and evidence established defendant had been living in the same apartment as Brashers and McPherson but that he was forced to leave after they called the police and asked to have him removed. The officer who responded to the call testified that defendant was very angry with the victims. Taylor-McMillon testified that she drove defendant around to look for his car that day but they could not find it. Later, defendant asked her to drive him to an apartment building next door to the victims' apartment building, and he instructed her to wait outside while he and McMillon left with a bat in hand. When defendant and McMillon returned, they no longer had the bat. Taylor-McMillon testified that she did not see that either defendant or McMillon had a gun. But when defendant and McMillon got back in the car, defendant said something about the clip being empty, and that they needed to get rid of the gun.

A reasonable jury could infer that the purpose for this last visit to Brashers' and McPherson's apartment was to shoot and kill them. *Clark*, 330 Mich App at 437. Defendant first learned his car had been "towed" from Brashers' and McPherson's apartment before 8:00 a.m. on December 28, 2020. The police responded at about 8:00 a.m. to an unwanted guest complaint and Kalamazoo Police Sergeant Michael White told defendant to leave the apartment. Taylor-McMillon testified that defendant called her early on the morning of December 28, 2020, and asked her to pick him up at Brashers' apartment. When she arrived, police officers were there, and defendant was removing his belongings from the apartment. Defendant was angry and told Taylor-McMillon that he believed Brashers and McPherson stole his car. A few hours later, Taylor-McMillon drove defendant back to the apartment to inquire about the car again. The police responded at about 11:30 a.m. and Sergeant White spoke with Brashers and defendant. Sergeant White testified that defendant was still angry and "started slamming his fists on his legs."

Taylor-McMillon testified that she did not remember what time she drove defendant and McMillon back to the apartment the evening of December 28, 2020, but she believed it was before 8:45 p.m. because her father needed her car to drive to work at that time. A neighbor in the apartment building testified that she heard six or seven gunshots that evening at 9:29 p.m. It is premeditated murder if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder. *Clark*, 330 Mich App at 436-437. Defendant had nearly the entire day on December 28, 2020, to consider his actions and "cool off" so to speak, such that there was no adequate provocation for the murders. A lack of adequate provocation indicates the murders were deliberate. Furthermore, video evidence established that defendant and McMillon were inside the apartment for just eight seconds. A reasonable jury could conclude that defendant and McMillon intended to shoot and kill the victims due to the very short amount of time they were in the apartment.

Even without defendant's confession, there was sufficient evidence from which a rational jury could conclude that defendant intended to kill Brashers and McPherson, that he acted with premeditation and deliberation to effect that intent, and that he knew that McMillon shared that intent when he acted to aid and encourage McMillon. See *Bennett*, 290 Mich App at 472.

Consequently, there was sufficient evidence to support the jury's verdict even without defendant's confession. See *Clark*, 330 Mich App at 436.

Clearly, defendant's confession was powerful evidence that he recruited McMillon to go to the apartment with the express purpose of shooting and killing both Brashers and McPherson. Accordingly, there was ample evidence to support the jury's verdict, see *Clark*, 330 Mich App at 436, and the trial court did not abuse its discretion when it denied defendant's motion for a new trial premised on insufficient evidence, see *Orlewicz*, 293 Mich App at 100.

## IV. FAIR TRIAL

Lastly, defendant argues that the prosecutor engaged in misconduct that deprived him of a fair trial, and defense counsel's failure to object to the misconduct amounted to ineffective assistance of counsel. Defense counsel objected to some of the questions at issue, but not others. Therefore, some are preserved for appellate review, but others are not.

## A. STANDARD OF REVIEW

This Court reviews de novo whether a prosecutor's misconduct deprived the defendant of a fair and impartial trial. *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). The issue of whether a defendant was denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Posey*, 512 Mich 317, 332; 1 NW3d 101 (2023); *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Questions of fact are reviewed for clear error, while questions of law are reviewed de novo. *Posey*, 512 Mich at 332. This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *People v Gioglio (On Remand)*, 296 Mich App 12, 19-20; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). Because the trial court did not hold an evidentiary hearing on this claim of error, there are no factual findings to which this Court must defer, and this Court's review is for mistakes that are apparent on the record alone. See *id*. at 20.

## B. ANALYSIS

Defendant alleges the prosecutor committed a pattern of errors that deprived him of a fair trial. He argues the prosecutor used leading questions to put facts into evidence. We disagree.

A prosecutor's role and responsibility is to seek justice, not merely to convict. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Thus, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. *Id*. A prosecutor can jeopardize a defendant's right to a fair trial by interjecting issues broader than the defendant's guilt or innocence. *Id*. at 63-64. This Court examines claims of prosecutorial misconduct on a case-by-case basis and on the whole record to determine whether the conduct at issue was improper and deprived the defendant of a fair trial. *Id*.

A leading question is one "that suggests the answer to the person being interrogated[.]" *Black's Law Dictionary* (11th ed). See also *People v Hodge*, 141 Mich 312; 104 NW 599 (1905). MRE 611(d)(1) provides that "[l]eading questions should not be used on direct examination except

as necessary to develop a witness's testimony."[1]  Questions that call attention to subjects about which testimony is desired but do not suggest the answers expected are not leading.  *Hodge*, 141 Mich at 314.  "In order to demonstrate that reversal is warranted for the prosecution asking leading questions, it is necessary to show some prejudice or patterns of eliciting inadmissible testimony." *People v Johnson*, 315 Mich App 163, 200; 889 NW2d 513 (2016) (citation and quotation marks omitted).

Defendant contends the first example of prosecutorial misconduct occurred when the prosecutor asked Taylor-McMillon whether McMillon told her that defendant used the bat to break the sliding door into the apartment, and asked her whether McMillon told her that defendant struck Brashers with the bat.  Defense counsel objected to the question as leading and the trial court overruled the objection.  Taylor-McMillon replied "no" to both questions.

These questions were not leading.  The questions did not suggest an answer, and Taylor-McMillon denied that McMillon had told her that defendant used the bat to break the sliding glass door and to hit the victim. These questions were proper questions to ask on re-direct examination. Accordingly, the trial court allowing the prosecutor's use of fact-laden questions was not an error.

Defendant also complains that the prosecutor attempted to question Officer Cary about statements that Taylor-McMillon made to him.  He asserts that Officer Cary's statements would have been hearsay, but he acknowledges the trial court sustained defense counsel's objection. Therefore, defendant was not prejudiced by the attempted questioning.

Lastly, defendant argues the prosecutor improperly questioned Tyshaun Cameron, defendant's step-brother.  Specifically, defendant maintains that it was improper for the prosecutor to ask Cameron about whether he told Officer Cary that defendant was the shooter.  Defense counsel objected to the question, asserting it was hearsay and beyond the scope of direct and cross-examination.  The trial court overruled the objection.  Defendant asserts this question sought testimony that would be inadmissible hearsay, because the only way that Cameron would have known whether defendant was the shooter would be if someone else told Cameron.  This is inaccurate.

There is no indication the prosecutor was trying to elicit the answer to prove the truth of the statement Cameron allegedly made.  Rather, the context shows the prosecutor was attempting to test Cameron's credibility by asking whether he offered a different version of events when questioned by officers than the version he gave at trial.  The prosecutor had the right to explore his own witness's credibility pursuant to MRE 607, which provides that any party, including the party that called a witness, may attack the witness's credibility.

Defendant further argues the prosecution erred in asking Cameron whether he learned from McMillon that defendant used the bat to break the sliding glass door and to hit Brashers.  Defendant

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024.  See ADM File No. 2021-10, 512 Mich lxiii (2023).  This opinion relies on the version of the rules in effect at the time of the trial in 2022.

suggests that these questions amounted to error and prejudiced his trial because the prosecutor argued those facts in closing argument.[2]  Even if these questions were attempting to elicit inadmissible hearsay, defendant has not shown prejudice.  Defendant told Officer Cary that he used the bat to break the glass and strike Brashers.  Accordingly, whether McMillon told Cameron the same thing amounted to cumulative evidence.   Defendant agrees that the testimony was cumulative, but he argues that allowing the jury to hear that testimony added weight to defendant's statements to Officer Cary and that absent that corroboration, the jury would not have believed him.  The testimony about how defendant used the bat was not particularly compelling testimony.  As already discussed, defendant specifically told Officer Cary that he wanted to kill Brashers and McPherson and that he tried to get McMillon's gun for that purpose.  He stated that McMillon refused to give it to him, so McMillon was the one who shot Brashers and McPherson.  Nevertheless, defendant made it clear that he wanted to kill Brashers and McPherson.  In light of the other evidence, there is no possibility that, but for the admission of the hearsay testimony about the bat, the outcome would have been different.  Therefore, defendant has not shown how eliciting this testimony deprived him of a fair trial.  See *Dobek*, 274 Mich App at 63.

Defendant also complains that while defense counsel objected to some of the questions challenged above, those instances showed that defense counsel did not fully understand the rules of evidence because her grounds for objecting were incorrect. While he concedes this does not amount to deficient performance, he argues it plays into the failure to move for a mistrial or object to prosecutorial misconduct.  He then argues that defense counsel's failure to object to Cameron's hearsay testimony fell below an objective standard of reasonableness under prevailing professional norms.

In order to establish his claim of ineffective assistance, defendant must show that defense counsel's decision fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for defense counsel's error, the result of the proceeding would have been different.  See *Gioglio*, 296 Mich App at 22, citing *Strickland*, 466 US at 688.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Gioglio*, 296 Mich App at 23.

A reasonable lawyer in defense counsel's position might choose not to object.  The defense theory of the case was that McMillon chose to kill Brashers and McPherson and that defendant did not know that he intended to do so and did not himself have the intent to kill Brashers and McPherson.  To that end, a reasonable defense lawyer could conclude that it was to the defense's benefit to allow hearsay testimony that further established that McMillon admitted to shooting the victims. The defense was then free to argue that the confession was coerced and implausible and did not accurately reflect defendant's intent but was instead an attempt to benefit his sister.  Thus, defense counsel's performance was not objectively unreasonable.  Furthermore, defendant has not

---

[2] There was testimony that McMillon told Cameron that he shot Brashers and McPherson.  As the prosecutor correctly notes on appeal, that admission was admissible under MRE 804(b)(4)(B) because McMillon was an unavailable codefendant, the admission tended to expose McMillon to criminal liability, it was offered to show that defendant was not the shooter, and there was other evidence that tended to suggest the trustworthiness of the statement.

established that there is a reasonable probability the outcome would have been different had the particular objections been raised.

Affirmed.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani